STATE OF CONNECTICUT *v.* RANDY KIRSCH
(SC 16775)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued February 20—officially released May 6, 2003

*Hubert J. Santos*, with whom, on the brief, were *Hope C. Seeley*, *Patrick S. Bristol* and *Steven D. Ecker*, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, was *Scott J. Murphy*, state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Randy Kirsch, appeals[1] from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3),[2] manslaughter in the second degree with a motor vehicle in violation of General Statutes § 53a-56b,[3] and operating a motor vehicle while under the influence of intoxicating liquor or drugs in violation of General Statutes (Rev. to 1997) § 14-227a (a).[4] The defendant claims that the trial court improperly: (1) failed to conduct a hearing, pursuant to *State v. Porter*, 241 Conn. 57, 68–69, 698 A.2d 739 (1997), cert.

[1] The defendant appealed from the judgment of the trial court to the Appellate Court. We then transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes § 53a-55 provides in relevant part: "(a) A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person.

"(b) Manslaughter in the first degree is a class B felony."

[3] General Statutes § 53a-56b provides: "(a) A person is guilty of manslaughter in the second degree with a motor vehicle when, while operating a motor vehicle under the influence of intoxicating liquor or any drug or both, he causes the death of another person as a consequence of the effect of such liquor or drug.

"(b) Manslaughter in the second degree with a motor vehicle is a class C felony and the court shall suspend the motor vehicle operator's license or nonresident operating privilege of any person found guilty under this section for one year."

[4] General Statutes (Rev. to 1997) § 14-227a (a) provides: "No person shall operate a motor vehicle while under the influence of intoxicating liquor or any drug or both. A person commits the offense of operating a motor vehicle while under the influence of intoxicating liquor or any drug or both if he operates a motor vehicle on a public highway of this state or on any road of a district organized under the provisions of chapter 105, a purpose of which is the construction and maintenance of roads and sidewalks, or on any private road on which a speed limit has been established in accordance with the provisions of section 14-218a, or in any parking area for ten or more cars or on any school property (1) while under the influence of intoxicating liquor or any drug or both or (2) while the ratio of alcohol in the blood of such person is ten-hundredths of one per cent or more of alcohol, by weight."

denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), before admitting into evidence a hospital blood screening test reflecting the defendant's blood alcohol level; (2) admitted into evidence a report by the hospital's alcohol and abuse counselor; (3) denied the defendant's motion for a mistrial after a witness testified as to her belief that the defendant was an alcoholic; (4) instructed the jury on reasonable doubt; and (5) rendered judgment of conviction for both manslaughter in the first degree and manslaughter in the second degree with a motor vehicle for the death of one person. We reject the defendant's claims and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of July 28, 1998, the defendant attended a party at the home of Claudia Sklar, a partner at the law firm where the defendant had been the managing partner, to bid farewell to the members of their firm, which had disbanded the previous month. The defendant and other attorneys had suggested that the party be a "bring your own bottle" affair. The defendant arrived at 6 p.m., carrying a full bottle of Chivas Regal scotch. He poured himself a drink upon his arrival and drank several glasses of straight scotch over the course of the next few hours. He seemed uncharacteristically loud, candid and demonstrative in conversations with fellow partygoers. Several guests concluded that the defendant was intoxicated. At 9:15 p.m., the defendant gave a brief speech to the group, thanking them for their contributions to the firm. He left the party at approximately 9:30 p.m., without saying goodbye to anyone and without anyone noticing his departure. After he left, several guests noticed that the full bottle of scotch that the defendant had brought to the party had only one to two inches of scotch left in it. The defendant was the only person to drink from that bottle that evening.

After leaving the party, the defendant drove his vehicle toward his home in Glastonbury, traveling the back roads from Sklar's house to the Park Road interchange of Interstate 84, where the defendant erroneously entered the exit ramp, heading west in the eastbound lanes at a high rate of speed. After traveling approximately 3.9 miles on Interstate 84, the defendant exited onto Route 9, heading south in the northbound lanes. Several motorists honked their horns in an attempt to alert the defendant that he was driving in the wrong direction, and two other drivers nearly got into accidents trying to avoid the defendant's vehicle. The defendant made no attempt to slow down. A few motorists contacted the Connecticut state police to alert them that a vehicle was traveling in the wrong direction. When a cluster of five or six cars approached the defendant's vehicle on Route 9, he rapidly drove his vehicle across several lanes and exited at a high rate of speed, traveling southbound on the northbound entrance ramp from Route 71 onto Route 9.

At that same time, Lawrence Pisani, who, along with his wife, Lisa Pisani, and their eleven year old daughter, Ashley Pisani, was driving home from a softball tournament, entered from Route 71 onto the Route 9 northbound ramp. Lawrence Pisani looked left for merging traffic when he heard his wife scream. He turned to see the oncoming headlights of the defendant's vehicle, braked and steered left, but the defendant's vehicle hit the right front end of the Pisani vehicle without ever braking. State Trooper Roger Beaupre, who had been searching for the errant motorist, was driving on Route 71 toward the Route 9 exit when he saw Lawrence Pisani frantically waving for help. Beaupre called for emergency assistance and then attended to Lisa Pisani, who was conscious and bleeding. Neither Lawrence Pisani nor Ashley Pisani was seriously injured. Lisa

Pisani was transported to Hartford Hospital, where she died from the injuries she had sustained in the accident.

After taking measures to assist Lisa Pisani, Beaupre went over to the defendant's vehicle, where the defendant was trapped inside, and, while at a distance of approximately six to ten inches from the defendant's face, noticed a strong smell of alcohol coming directly from the defendant's breath. On the basis of his training and experience and his observations of the defendant, Beaupre concluded that the defendant was intoxicated. George Bodycoat, a firefighter who had been called to the scene to extricate the defendant from his vehicle, also noticed a strong smell of alcohol on the defendant's breath.

The defendant was taken to Saint Francis Hospital and Medical Center (hospital), where he was admitted at 10:43 p.m. The emergency department nursing assessment and encounter forms noted an alcohol smell on the defendant's breath. In accordance with the hospital's "set order" that blood be drawn from all patients upon entrance to the trauma room, at approximately 11 p.m., the defendant's blood was drawn. Alcohol is one of the substances for which the hospital routinely screens because it acts as a sedative and may mask pain. The defendant's blood test indicated a blood alcohol content of 0.210.[5] The amount of alcohol one would need to consume in order to have a blood alcohol content of 0.210 is almost exactly equivalent to the volume of alcohol contained in the scotch missing from the bottle that the defendant had brought to Sklar's party.

---

[5] The test reflected that the defendant's "serum" blood alcohol content was 0.253 percent alcohol. "Serum" is the liquid portion of the blood separated from the solids and a serum blood alcohol content is on average 16 percent higher than a whole blood alcohol content. See 1 E. Fitzgerald, Intoxication Test Evidence (2d Ed. 1995) § 19:3, p. 19-10, and § 19:16, fig. 29. A serum result of 0.253 translates to a 0.210 whole blood alcohol level, which is the measure used to determine legal intoxication.

Scheuster Christie, a general trauma surgeon at the hospital, who saw the defendant between 4 a.m. and 6 a.m. the morning after the accident, noted a smell of alcohol on the defendant's breath. That same morning, another treating physician noted on the defendant's chart, "[m]ore awake, lucid, not slurring speech. Understands speech better."

The record also reveals the following facts and procedural history. Pursuant to a subpoena, the state obtained the defendant's blood test results and his hospital records. Thereafter, the defendant was charged by substitute information with manslaughter in the first degree in violation of § 53a-55 (a) (3), manslaughter in the second degree with a motor vehicle in violation of § 53a-56b, and operating of a motor vehicle while under the influence of intoxicating liquor or drugs in violation of § 14-227a (a). The defendant filed a motion for a hearing pursuant to State v. Porter, supra, 241 Conn. 57, to determine whether the blood test constituted scientifically reliable evidence and a motion in limine to exclude his test results and hospital records. The trial court denied the defendant's motions, concluding that the test results and the hospital records were admissible as business records pursuant to General Statutes § 52-180, and that the test was reliable.

At trial, the defendant offered the testimony of several physicians in support of his theory that he was not intoxicated and that the accident was the result of a seizure that had impaired his consciousness.[6] The

[6] The defendant's wife testified that, on three previous occasions, for a period of several minutes, the defendant suddenly had a blank stare on his face, had become unresponsive and, on one occasion, had gagged violently, but, afterward, had no recollection of those incidents. She also testified that she did not call for medical assistance when these incidents occurred, nor did she or the defendant inform the defendant's physician or neurosurgeon shortly thereafter of the incidents. The defendant's wife further testified that the defendant had continued to drive his vehicle on a regular basis after those incidents had occurred. The defendant's experts based their conclusion that the defendant had suffered a seizure while driving his vehicle,

defendant pointed to the fact that, on the morning of the accident, he had undergone his first radiation treatment for a tumor, caused by neurofibromatosis type 2 disease,[7] that was pressing against the left temporal lobe of his brain, causing swelling in his brain. The defendant contended that this condition, in combination with his ingestion of Zyban, a prescription medication to assist smoking cessation, and St. John's Wort, an herbal supplement, had caused a seizure that led to the accident. The defendant also offered expert testimony that the ingestion of these pills, in addition to other mineral and vitamin supplements that the defendant regularly had taken, could have interfered with the results of the test reflecting the defendant's blood alcohol level.

The jury returned a verdict of guilty on all the counts. Thereafter, the trial court sentenced the defendant, in accordance with the jury's verdict, to a total effective sentence of fifteen years imprisonment, suspended after ten years, five years probation and a $21,000 fine.[8] This appeal followed. Additional facts will be set forth as necessary.

---

in part, on the fact that previous seizures had occurred. One of those experts, Andrew Cole, a neurologist at Massachusetts General Hospital, testified that the symptoms described by the defendant's wife were consistent with a temporal lobe seizure.

[7] Neurofibromatosis type 2 disease is an inherited disorder, which causes tumors to grow in the brain and can lead to hearing loss. The defendant was diagnosed with the disease in 1997 and later that year had surgery to remove a tumor from his right ear.

[8] The trial court sentenced the defendant to fifteen years imprisonment, execution suspended after five years, five years probation and a $10,000 fine for the first degree manslaughter conviction; ten years imprisonment for the conviction of manslaughter in the second degree with a motor vehicle, to run concurrently with the first degree manslaughter sentence, and a $10,000 fine; and six months imprisonment and a $1000 fine for the conviction of operating a motor vehicle while under the influence.

I

We begin with the defendant's claim that the trial court improperly failed to conduct a hearing to determine the admissibility of the hospital blood test. In *State* v. *Porter*, supra, 241 Conn. 68, we adopted the test for determining the admissibility of scientific evidence set forth in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). We noted therein two requirements established under *Daubert*. First, "that the subject of the testimony must be scientifically valid, meaning that it is scientific knowledge rooted in the methods and procedures of science . . . and is more than subjective belief or unsupported speculation. . . . This requirement establishes a standard of evidentiary reliability . . . as, [i]n a case involving scientific evidence, *evidentiary reliability* will be based upon *scientific validity*." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Porter*, supra, 64. Second, the scientific evidence "must 'fit' the case in which it is presented. . . . In other words, proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract." (Citation omitted.) Id., 65.

We concluded, consistent with the *Daubert* test, that "the focus of a validity assessment must be solely on principles and methodology, not on the conclusions that they generate. . . . So long as the methodology underlying a scientific opinion has the requisite validity, the testimony derived from that methodology meets the *Daubert* threshold for admissibility, even if the judge disagrees with the ultimate opinion arising from that methodology, and even if there are other methodologies that might lead to contrary conclusions." (Citation omitted; internal quotation marks omitted.) Id., 81–82. Accordingly, although the trial court properly serves "a gatekeeper function" to ensure that the evidence is

sufficiently reliable; id., 69; it "should . . . deem scientific evidence inadmissible only when the methodology underlying such evidence is . . . incapable of helping the fact finder determine a fact in dispute." Id., 89.

The defendant claims that the trial court improperly failed to conduct a *Porter* hearing to determine the scientific validity of the hospital blood screening test on the basis of two improper conclusions. First, the defendant contends that the trial court improperly concluded that, because the blood test satisfied § 52-180, which sets forth the admissibility requirements for a business record, the reliability of the test was established sufficiently so as to obviate the need for a *Porter* hearing. Second, the defendant contends that the trial court improperly failed to consider the test's lack of reliability for legal purposes generally and under the facts of this case specifically. We agree with the defendant's first contention, but reject the latter.

We begin by setting forth the standard by which we review the defendant's claim. "We have held generally that [t]he trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . *State* v. *Bruno*, 236 Conn. 514, 549, 673 A.2d 1117 (1996); see *State* v. *Sauris*, 227 Conn. 389, 406–407, 631 A.2d 238 (1993); see also *General Electric Co.* v. *Joiner*, 522 U.S. 136, 141–44, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) (abuse of discretion standard of review applies to decision to admit or exclude evidence under *Daubert*). . . . [C]onsistent with these authorities, [we have concluded] that a trial court's ruling on a *Porter* issue is subject to an abuse of discretion standard on appeal." (Internal quotation marks omitted.) *State* v. *Pappas*, 256 Conn. 854, 878, 776 A.2d 1091 (2001). Accordingly, we limit the scope of our

review to whether the trial court abused its discretion in determining that no *Porter* hearing was required.

## A

We first address the trial court's conclusion that the hospital test was admissible as a business record because the requirements of § 52-180 were satisfied. Section 52-180 sets forth an exception to the evidentiary rule otherwise barring admission of hearsay evidence for business records that satisfy express criteria. *Calcano* v. *Calcano*, 257 Conn. 230, 240, 777 A.2d 633 (2001); *New England Savings Bank* v. *Bedford Realty Corp.*, 246 Conn. 594, 600, 717 A.2d 713 (1998); see also Conn. Code Evid. § 8-4 (incorporating § 52-180). Section 52-180 (a) "provides that a record of an act, transaction, occurrence or event is admissible as evidence of that act, transaction, occurrence, or event, provided that the record was made in the regular course of business." *Pagano* v. *Ippoliti*, 245 Conn. 640, 650–51, 716 A.2d 848 (1998). The rationale for the exception derives from the inherent trustworthiness of records on which businesses rely to conduct their daily affairs. *Calcano* v. *Calcano*, supra, 240–41 (§ 52-180 "recognizes the inherent trustworthiness of documents created for business rather than litigation purposes"); *Bell Food Services, Inc.* v. *Sherbacow*, 217 Conn. 476, 486, 586 A.2d 1157 (1991) ("fact that the business relies on such records tends to establish their trustworthiness"); see generally *New England Savings Bank* v. *Bedford Realty Corp.*, supra, 600–601 (setting forth development of rule).

We previously have not addressed the question of whether satisfaction of the criteria for admissibility as a business record under § 52-180 necessarily obviates the need for a *Porter* hearing. We have stated in general, however, that "[t]he fact that [certain] records constitute a business record within the meaning of § 52-180 . . . does not complete our analysis of the defendant's

claim [challenging their admissibility]. Once these criteria have been met by the party seeking to introduce the record . . . it does not necessarily follow that the record itself is generally admissible, nor does it mean that everything in it is required to be admitted into evidence." (Internal quotation marks omitted.) *State* v. *Berger*, 249 Conn. 218, 231, 733 A.2d 156 (1999). Accordingly, if admission of the record in part, or as a whole, would violate some other rule of evidence, the objectionable portion may not be admitted. See id. (in addition to satisfying business records hearsay exception, "information contained in the record must be relevant to the issues being tried" [internal quotation marks omitted]); *Pagano* v. *Ippoliti*, supra, 245 Conn. 651 (trial court improperly admitted documents that satisfied business record exception, but contained second level of hearsay); *River Dock & Pile, Inc.* v. *O & G Industries, Inc.*, 219 Conn. 787, 799, 595 A.2d 839 (1991) (trial court must consider on remand whether person rendering opinion included within otherwise admissible business record would be qualified to give that opinion in oral testimony); *Pickel* v. *Automated Waste Disposal, Inc.*, 65 Conn. App. 176, 190, 782 A.2d 231 (2001) (trial court did not abuse discretion by excluding report qualified as business record for purposes of hearsay rule when report contained inadmissible opinion evidence by person unqualified as lay witness to give opinion as to cause of accident). Indeed, this rule is embodied in General Statutes § 4-104, which "provides that a hospital record may be admitted in evidence as a business record '*if not otherwise inadmissible.*' " (Emphasis added.) *State* v. *Daniels*, 180 Conn. 101, 104, 429 A.2d 813 (1980).

This reasoning applies with equal force in the present case.[9] The fact that the record does not constitute hear-

9 The state contended in oral argument before this court that, although scientifically *unreliable* evidence, such as an experimental technique, contained within a business record would not be admissible, the blood test in

say under § 52-180 does not address the evidentiary question at issue in *Porter*. The former question goes to the reliability of the statements contained therein; the latter question goes to the scientific reliability of the methodology that forms that basis of the statements. We conclude, therefore, that the trial court improperly concluded that, because the hospital test satisfied § 52-180, it did not need to consider whether a *Porter* hearing was required.

## B

The trial court, however, did not limit its reason for denying the defendant's request for a *Porter* hearing to this one ground.[10] The trial court further determined that no hearing was required because "[t]here is nothing unique about drawing blood at the hospitals, no uniquely scientific and novel scientific theory that [would require] a *Porter* hearing . . . ." We agree with this conclusion.

In *Porter*, "[w]e explicitly acknowledged . . . that some scientific principles have become so well established that an explicit *Daubert* analysis is not necessary for admission of evidence thereunder. . . . Evidence derived from such principles would clearly withstand

the present case was admissible as a business record because of its inherent reliability. In our view, this argument reflects circular reasoning. One cannot first determine the reliability of the methodology on which the statements in the business record are predicated and thereafter conclude that the mere fact that the business records requirements are satisfied obviates the need for a determination of the scientific reliability of that methodology.

[10] It is clear, however, that, even if the trial court had relied solely on the business records exception as its basis for denying the defendant's request for a *Porter* hearing, we would not limit our review to that ground. It is well established that this court will affirm a trial court's evidentiary ruling if there is any reasonable basis on which to do so. See *State* v. *Ramos*, 261 Conn. 156, 175, 801 A.2d 788 (2002) ("[e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion" [internal quotation marks omitted]); *State* v. *Coleman*, 241 Conn. 784, 789, 699 A.2d 91 (1997); *State* v. *Barnes*, 232 Conn. 740, 746–47, 657 A.2d 611 (1995).

a *Daubert* analysis, and thus may be admitted simply on a showing of relevance. . . . As an example of such a principle, this court cited a Montana court's conclusion that a *Daubert* analysis is not necessary for ordinary fingerprint identification evidence to be admissible. [*State* v. *Porter*, supra, 241 Conn. 85 n.30], citing *State* v. *Cline*, 275 Mont. 46, 55, 909 P.2d 1171 (1996)." (Citation omitted; internal quotation marks omitted.) *State* v. *Reid*, 254 Conn. 540, 546, 757 A.2d 482 (2000).

"Although this court in *Porter* explicitly adopted the *Daubert* test to determine the admissibility of scientific evidence; see *State* v. *Porter*, supra, 241 Conn. 68; we did not explicitly overrule Connecticut precedent regarding the evidence to which such a test should apply. Prior to *Porter*, this court had recognized that the *Frye* [v. *United States*, 293 F. 1013 (D.C. Cir. 1923)] test for admissibility should not apply to all expert testimony, but only to that which involves 'innovative scientific techniques . . . .' *State* v. *Borrelli*, 227 Conn. 153, 163, 629 A.2d 1105 (1993); *State* v. *Hasan*, 205 Conn. 485, 489, 534 A.2d 877 (1987). In *Porter*, we recognized that *Daubert's* vagueness as to how and when to apply the factors of the test was necessary. *State* v. *Porter*, supra, 78. In order to maintain flexibility in applying the test, we did not define what constitutes 'scientific evidence.' Id., 78–79. Accordingly, we must examine the [evidence] at issue in the present case to determine whether it is the type of evidence contemplated by *Porter*." *State* v. *Reid*, supra, 254 Conn. 546.

The two principal analytical techniques commonly used in laboratories to detect the presence of alcohol, or more specifically, ethanol, in the body are the enzyme method and gas chromatography. See 2 P. Giannelli & E. Imwinkelried, Scientific Evidence (3d Ed. 1999) § 22-3 (B), p. 266. In the present case, the hospital used an enzyme method, using alcohol dehydrogenase, to test

the defendant's blood. See 2 R. Erwin, Defense of Drunk Driving Cases (3d Ed. 2002) § 17.08, p. 17-39 (scientific explanation of enzyme method). In layperson's terms, George H. Barrows, the director of the hospital's laboratories, explained during his testimony that the test "uses an enzyme that reacts with the alcohol, and produces a cofactor change, which causes a colorimetric change that is measured by a spectrophotometer and the amount of the change is directly proportional to the alcohol level in the patient's [blood] serum. So that when the patient's sample was placed on the particular solid media, it becomes lighter or darker, depending on the . . . amount of material present."

The leading treatises on scientific evidence indicate that this testing methodology is used universally in clinical settings to test blood for alcohol and is the predominate method utilized in such settings. See 2 R. Erwin, supra, § 17.04, p. 17-8, and § 17.08, p. 17-38; P. Giannelli & E. Imwinkelried, supra, § 22-3 (B), p. 266. Barrows testified that this methodology has been used by his hospital and a majority of hospitals nationwide for at least fifteen years. Accordingly, hospitals regularly and routinely have relied on the results generated from the methodology underlying this test to make treatment decisions for their patients.

Moreover, this methodology has been recognized as a reliable basis for legal purposes. Regulations promulgated by the commissioner of public safety cite this methodology as one of four that may be used by laboratories to determine blood alcohol content. See Regs., Conn. State Agencies § 14-227a-3a.[11] Additionally, other

---

[11] Section 14-227a-3a of the Regulations of Connecticut State Agencies provides: "(a) No person shall operate a laboratory for the performance of chemical tests within the scope of Sections 14-227a-1a to 14-227a-10a, inclusive, of the Regulations of Connecticut State Agencies until the commissioner approves the methods of conducting the alcohol analyses and certifies each analyst who will be performing such chemical tests.

"(b) To be eligible for approval, a method shall be based upon one or more of the following quantitative techniques:

jurisdictions have recognized the validity of this methodology for legal purposes. See, e.g., *Mehl* v. *State*, 632 So. 2d 593, 595 (Fla. 1993); *Barna* v. *Commissioner of Public Safety*, 508 N.W.2d 220, 222 (Minn. App. 1993); see also *State* v. *Graham*, 275 Kan. 176, 61 P.3d 662, 668 (2003) ("enzyme analysis technique's validity is generally accepted as reliable within the scientific field of determining blood alcohol concentration"; test meets admissibility requirements "as a matter of law"). Therefore, we conclude that the methodology underlying the hospital blood test at issue is not the type of novel, experimental or innovative scientific technique which triggers the need for a *Porter* hearing.[12] Accordingly, the trial court properly determined that the reliability of the test was so well established that a *Porter* hearing was not a necessary predicate to its admission into evidence.

Although the defendant acknowledges the widespread use of the test at issue for *clinical* purposes, he contends that the test lacks sufficient reliability for *legal* purposes. He makes the following claims in support of this contention: (1) almost all forensic laboratories use the gas chromatography method, the so-called "gold

"(1) titration with potassium dichromate;

"(2) use of alcohol dehydrogenase;

"(3) gas chromatography;

"(4) infrared analysis; or

"(5) fuel cell analysis.

"(c) The commissioner may approve a method not based on the techniques listed in subsection (b) of this section, provided that such alternative method produces a comparable degree of precision and accuracy.

"(d) Test results shall not be reported until the requirements of subsection (a) of this section are met. Failure to obtain such approvals or certifications may result in the suspension or revocation of any approvals or certifications subsequently obtained."

[12] Indeed, as the Kansas Supreme Court noted, "[e]nzyme analysis is not a novel method for determining blood alcohol concentration; the first journal published on the method appeared in 1951. See R. Bonnichsen & H. Theorell, An Enzymatic Method for the Microdetermination of Ethanol, 3 Scand. J. Clinical Lab. Invest. 58 (1951)." *State* v. *Graham*, supra, 61 P.3d 668.

standard," which is generally viewed as more specific and less subject to interference by other substances; (2) clinical laboratories do not adhere to the same rigorous chain of custody requirements as forensic laboratories; (3) the hospital's own internal memo expressly stated that the test is not to be used for legal purposes;[13] and (4) the test results would have been inadmissible in a driving while intoxicated case because the test was not taken in accordance with state regulations, citing Regs., Conn. State Agencies §§ 14-227a-3a (analyst conducting test must be certified by department of public safety); and 14-227a-90 (duplicate testing required). Essentially, the defendant claims that these facts demonstrate that the "fit" required under *Porter*, between the methodology generally and its application specifically, is not satisfied.

We disagree with the premises underlying the defendant's claim for several reasons. First, the defendant misconstrues the "fit" requirement under *Porter*. As we explained in *Porter*, that requirement simply means that the "proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract."

[13] A memo from Barrows to the hospital medical records department, dated January 3, 1995, provided in relevant part: "The laboratory at [the hospital] performs alcohol evaluations for diagnostic and treatment purposes only. Law enforcement agencies in the state are available for legal alcohol testing and the hospital laboratory is not funded or certified in this area.

"The method employed, alcohol dehydrogenase, has careful quality control and is sufficient for medical evaluation. The method is not standardized for the purpose of legal evaluation. Moreover, customary hospital precautions accompany specimen handling, and rigorous chain of custody establishment is not part of hospital procedure. . . ."

On direct examination, Barrows testified that the fact that the alcohol dehydrogenase test is not intended to be used for legal purposes did not suggest that the test was unreliable. He stated that the testing equipment had "excellent reliability" and that the methodology was "very accurate" and "very reliable."

*State* v. *Porter*, supra, 241 Conn. 65. This inquiry considers whether the methodology is being utilized in a novel way for which it was not developed originally; see, e.g., *State* v. *Foret*, 628 So. 2d 1116, 1124–25 (La. 1993) (rejecting testimony of expert witness, based on "child sexual abuse accommodation syndrome," because syndrome only intended to create common language for those treating abuse victims, not as diagnostic tool); or whether it is scientifically reliable for one purpose, but not another. See, e.g., *State* v. *Mack*, 292 N.W.2d 764, 768 (Minn. 1980) (rejecting expert testimony based on hypnosis, noting that for hypnosis to be "therapeutically useful, it need not produce historically accurate memory"). In the present case, the blood test was not being used in a novel way, nor was it unreliable scientific evidence of the defendant's blood alcohol level.

Second, the defendant's criticisms of the reliability of the enzyme method test, as compared to other testing methodology and as applied in the present case, as well as his chain of custody claim, go to the weight of the evidence, not its admissibility. *State* v. *Porter*, supra, 241 Conn. 88 n.31 ("[o]nce the validity of a scientific principle has been satisfactorily established, any remaining questions regarding the manner in which that technique was *applied* in a particular case is generally an issue of fact that goes to weight, and not admissibility" [emphasis in original]); see *State* v. *Pappas*, supra, 256 Conn. 881 ("trial court properly concluded that issues regarding contamination are important and may bear on the weight of [mitochondrial deoxyribonucleic acid (mtDNA)] evidence in a particular case . . . but that those issues do not undermine the admissibility of the results of the mtDNA sequencing process used in this case" [citation omitted]). The defendant had the opportunity to, and indeed did, cross-examine the state's witnesses aggressively and offer his own expert to undermine the reliability of the test result.

Third, the defendant's reliance on the requirements for blood alcohol testing under the department of public safety's regulations is misplaced. Those regulations were promulgated pursuant to the commissioner of public safety's authority under General Statutes § 14-227a (d). That section provides only that testing that complies with the regulatory requirements is deemed to be competent evidence. See General Statutes § 14-227a (j). It does not, however, proscribe the admission of evidence that fails to satisfy those requirements. See *State* v. *Stern*, 65 Conn. App. 634, 640–41, 782 A.2d 1275, cert. denied, 258 Conn. 935, 785 A.2d 232 (2001) (failure to satisfy search warrant requirement under 1997 revision of § 14-227a [*l*] does not preclude admission of hospital blood alcohol test); *State* v. *Szepanski*, 57 Conn. App. 484, 490, 749 A.2d 653 (2000) (requirements of § 14-227a do not require exclusion of blood test performed at out-of-state hospital that did not conform to statutory requirements). We further note in this regard that blood alcohol results admitted under this section establish a rebuttable presumption of intoxication. The test evidence proffered by the state established no such presumption and the jury was free to accept or reject the evidence as credible. Indeed, the jury was instructed as to both parts of § 14-227a (a); see footnote 4 of this opinion; which permits a finding of guilty of operating a motor vehicle while under the influence of alcohol either on the basis of blood alcohol content or behavior exhibiting intoxication.[14] Therefore, the jury could have

[14] When instructing the jury on operating a motor vehicle while intoxicated, the trial court, citing § 14-227a (a), stated in relevant part: "A person commits the offense of operating a motor vehicle, while under the influence of intoxicating liquor or any drug or both, if he operates a motor vehicle on a public highway in this state: (1) While under the influence of intoxicating liquor or any drug or both; or (2) while the ratio of alcohol in the blood of such person is ten-hundredths of one percent or more of alcohol by weight." When instructing the jury on the manslaughter in the first degree charge, the trial court stated in relevant part: "If you find that the defendant was under the influence of alcohol, and thereby unfit to operate a motor vehicle, you may consider those facts in deciding whether he demonstrated an

agreed with the defendant that the application of the blood test in this case had not been reliable, but found him guilty of behavioral intoxication, based on other ample evidence. Accordingly, because the blood test was relevant to an issue in the case, and because the defendant's challenges to the methodology affected the weight of the testimony and not its reliability, the trial court properly admitted it into evidence.[15] See *State* v. *Reid,* supra, 254 Conn. 552.

## II

We next address the defendant's claim that the trial court improperly admitted into evidence a report by

extreme indifference to human life." When instructing the jury on manslaughter in the second degree with a motor vehicle, the trial court stated in relevant part: "A person is guilty of manslaughter in the second degree with a motor vehicle when, while operating a motor vehicle, under the influence of intoxicating liquor or any drug or both, he causes the death of another person, as a consequence of the effect of such liquor or drug." Thereafter, the court explained that "a person is under the influence of intoxicating liquor or any drug or both, when, as a result of drinking such . . . beverage or introducing such drug or both into his system, his mental, physical or nervous processes have become so affected that he lacks to an appreciable degree, the ability to function properly in relation to the operation of his motor vehicle."

[15] Moreover, we note that, even if a *Porter* hearing had been required, the evidence proffered by the state demonstrated, as a matter of law, that the *Porter* standard had been satisfied. Barrows explained to the jury the process by which the test results were obtained in a manner that would assist them in determining a relevant issue, namely, whether the defendant had been intoxicated when he drove his vehicle into the Pisani vehicle. The state's experts testified that the testing methodology had been used and relied upon by the hospital for more than fifteen years and had been used by clinical laboratories for the past twenty years. Barrows testified that the testing equipment regularly was monitored for accuracy and that the equipment had demonstrated "excellent reliability" to determine blood alcohol content. He further testified that, although the hospital laboratory was not certified to perform the testing by the department of public safety, its general practices were certified by the College of American Pathologists and the Joint Committee on Hospital Accreditation. Finally, Barrows testified that the hospital adhered to careful procedures in the collection, labeling and handling of the blood samples to ensure that the results were attributed to the correct patient. We conclude that this testimony established per se that

Mark McPherson, the hospital's drug and alcohol counselor. The following additional facts are relevant to our resolution of this claim. While at the hospital, the defendant was referred to McPherson by a treating physician. After the meeting, McPherson prepared a report in which he noted that an alcohol related motor vehicle accident was the reason for the referral and he stated that the defendant denied any prior problems related to drinking alcohol. The report, as transcribed, provided in relevant part: "[The defendant] did say that his wife [complains of] his drinking. [The defendant] was asked why she could [complain] based on what [he] said he drank. [He] said 'you would have to know my wife.'

"It is unlikely that [a person] with this high [blood alcohol level] would even be able to drink this amount and still start to drive. Most persons with a small or limited drinking [history] as [the defendant] stated would be passed out and not able to drive at all. This together with [the defendant's] remarks as to his wife's concern indicated a more serious drinking [history] than [the defendant] stated."

The defendant objected to the introduction of the report on several grounds, including that it was unfairly prejudicial, that the statement attributed to his wife was inadmissible hearsay, and that the referral notation on the report was an opinion on the ultimate issue. The trial court sustained the defendant's objections in part, ordering that the referral notation and the second paragraph of the report, in which McPherson set forth his opinion based on the test results and the wife's statement, be redacted.

Subsequently, the state elicited on direct examination testimony from Christie, the defendant's trauma surgeon, in which he stated his opinion that the defendant

the blood test was scientifically reliable evidence and that the trial court properly admitted the test into evidence.

was intoxicated. During cross-examination, defense counsel repeatedly inquired whether the defendant's clinical results and conduct, which indicated that he was alert, oriented and responsive, were consistent with a person with a blood alcohol content of 0.210. Christie responded that the results were not consistent for an average person, but could be consistent for a person who had developed a tolerance to alcohol due to more frequent drinking. Defense counsel then asked Christie a series of questions regarding the defendant's laboratory results indicating, inter alia, healthy liver and kidney functions to demonstrate that the defendant was not a heavy drinker.

Thereafter, outside the presence of the jury, the state argued that it should be permitted to introduce McPherson's report, because the defendant had opened the door by eliciting testimony suggesting that the blood test results were erroneous. Specifically, the state contended that the defendant had put before the jury the issue of whether the defendant was a heavy drinker and, accordingly, McPherson's report was relevant to that issue. The trial court concluded that defense counsel had put the issue before the jury and reversed its previous ruling, thus permitting the state to introduce McPherson's report.

The defendant contends that McPherson's report should have been excluded because it "in essence—called the defendant a liar and concluded he was a chronic alcoholic." The defendant claims that the trial court's admission of the report was improper because: (1) the defendant's cross-examination of Christie did not open the door; (2) even if the defendant had opened the door, the admission violated the defendant's right to due process and confrontation; (3) the report was unduly prejudicial; and (4) the report was privileged under General Statutes § 17a-688 and 42 U.S.C. § 290dd-2, which protect certain alcohol or drug patient records.

Our standard of review of an evidentiary ruling is dependent on whether the claim is of constitutional magnitude. If the claim is of constitutional magnitude, the state has the burden of proving the constitutional error was harmless beyond a reasonable doubt. *State* v. *Dehaney*, 261 Conn. 336, 355 n.12, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003); *State* v. *Ramos*, 261 Conn. 156, 176, 801 A.2d 788 (2002). Otherwise, in order to establish reversible error on an evidentiary impropriety, the defendant must prove both an abuse of discretion and a harm that resulted from such abuse. *State* v. *Young*, 258 Conn. 79, 94–95, 779 A.2d 112 (2001); *State* v. *Hamilton*, 228 Conn. 234, 244, 636 A.2d 760 (1994). This requires that the defendant demonstrate that "it is more probable than not that the erroneous action of the court affected the result." (Internal quotation marks omitted.) *State* v. *Meehan*, 260 Conn. 372, 397, 796 A.2d 1191 (2002).[16]

Although the defendant asserts that his right to confrontation was violated because he could not cross-examine McPherson on the report, the defendant conceded at oral argument that McPherson had not been unavailable and that he had failed to call him as a witness. Therefore, we conclude that the evidentiary ruling at issue is not of constitutional magnitude. Cf. *State* v. *Ferguson*, 260 Conn. 339, 351, 796 A.2d 1118 (2002) ("[w]hen the trial court excludes defense evidence that provides the defendant with a basis for cross-

---

[16] In *State* v. *Meehan*, supra, 260 Conn. 397 n.13, we reiterated that two lines of cases had developed in addressing the standard for reversing nonconstitutional evidentiary improprieties: "One line of cases states that the defendant must establish that it is more probable than not that the erroneous action of the court affected the result. . . . A second line of cases indicates that the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict." (Internal quotation marks omitted.) We conclude that in the present case the defendant has failed to prove the requisite harm under either standard.

examination of the state's witnesses . . . such exclusion may give rise to a claim of denial of the right to confrontation and to present a defense" [internal quotation marks omitted]). Accordingly, the burden is on the defendant to demonstrate that the admission of McPherson's report was an abuse of discretion and that reversal is warranted because of the substantial harm that resulted.

We conclude that, even if we were to assume that the trial court improperly admitted the report, the defendant's claim must fail because he cannot prove the requisite level of harm warranting a reversal. The dispositive issue at trial was whether the defendant was intoxicated while driving on the evening of the incident, not whether he had a history of heavy drinking. We recognize, however, that evidence as to whether the defendant had a history of heavy drinking had the potential to give rise to some prejudice to the defendant. During cross-examination of Christie, the defendant had attempted to point out inconsistencies between the defendant's appearance, behavior and responsiveness to clinical tests and his high blood alcohol level as a means of discrediting the test results. During that exchange, Christie testified that, although the defendant's clinical symptoms were not consistent with what one would expect from an average person with a blood alcohol level of 0.210, the symptoms were consistent with a person who had developed a tolerance for alcohol. Therefore, some prejudice was likely to accrue to the defendant from evidence suggesting that he was an alcoholic, as it would explain the inconsistency between his responsiveness to clinical tests and the high blood alcohol test results.

Irrespective of that fact, however, the evidence supporting the conclusion that the defendant was intoxicated when he drove his vehicle into the Pisani vehicle, killing Lisa Pisani, was so overwhelming that we cannot

conclude that any resulting prejudice was substantial. The state proffered evidence that: the defendant admitted that he had drunk three glasses of scotch in three and one-half hours; several people at the party, as well as emergency personnel at the scene of the accident and the defendant's treating physician at the hospital concluded that the defendant was intoxicated; the hospital blood screening test reflected that the defendant had a blood alcohol level of 0.210; the defendant was the only person to drink from the bottle of scotch he had brought to the party and that bottle was depleted by approximately twenty ounces when he left the party; Christie estimated that a person with a blood alcohol level of 0.210 would have had to drink approximately nineteen ounces of alcohol; and, perhaps most important, the defendant traversed at least two major roadways and two exits driving in the wrong direction. In the face of this mountain of evidence, we cannot conclude that the admission of the McPherson report affected the outcome of the trial.

## III

We next address the defendant's claim that the trial court improperly denied his motion for a mistrial. During redirect examination by the state, Sandra Fields, a former colleague of the defendant who had attended the Sklar party, testified as to her belief that the defendant was an alcoholic.[17] The defendant moved to strike

---

[17] The following exchange occurred between the state's attorney, Fields, defense counsel and the court:

"[State's Attorney]: Mrs. Fields, when was the first time you told anybody [that] the defendant was intoxicated at that party. And that being the Sklar party on July 28 of 1998?

"[Fields]: That I said he was intoxicated?

"[State's Attorney]: The words—either intoxicated or that he was drunk or words to that effect. When was the first time you told—made that remark to anybody?

"[Fields]: I told everyone that night. I told everyone that night after the party, and after we all came back in the kitchen, and were looking around.

"[Defense Counsel]: I'm going to object. It's not responsive. She was— answered the question.

the testimony and, outside the presence of the jury, moved for a mistrial. The trial court concluded that there was no prosecutorial misconduct and that the lay witness' opinion was not so prejudicial as to warrant a mistrial. Specifically, with respect to prejudice, the trial court noted that the issue in the case was not whether the defendant was an alcoholic for years before the incident, but, rather, whether he committed the acts alleged on the night in question. Accordingly, the trial court denied the motion for a mistrial, but granted the defendant's motion to strike Fields' statement that she believed the defendant was an alcoholic and instructed the jury to disregard it. The court also offered to provide a curative instruction at that time and at the end of the trial, which the defendant declined out of concern that any such instruction would highlight the prejudicial remark.

The defendant claims that the trial court improperly denied his motion for a mistrial because the prejudice resulting from Fields' statement was substantial, and that it was exacerbated by the court's improper admission of the McPherson report. The defendant contends that, this evidence, viewed together, demonstrates that he was deprived of a fair trial. We disagree.

"Appellate review of a trial court's decision granting or denying a motion for a [mistrial] must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally

---

"The Court: Is—

"[Defense Counsel]: And, what did you tell people about whether or not the defendant was intoxicated that night?

"[Fields]: I told them to look at the bottles on the table.

"[Defense Counsel]: I'm going to object on hearsay grounds, Your Honor, please.

"The Court: Overruled.

"[Fields]: And all the bottles on the table had an inch or two from the top missing. [The defendant] had an inch left, in the bottle. And, I believed that [the defendant] was an alcoholic."

presided. . . . Thus, [a] motion for a [mistrial] is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds. . . . In our review of the denial of a motion for mistrial, we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. . . . Therefore, we must determine whether [the] stricken, partial testimony was so prejudicial that it deprived the defendant of a fair trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Whipper*, 258 Conn. 229, 257, 780 A.2d 53 (2001); accord *State* v. *Newsome*, 238 Conn. 588, 628–29, 682 A.2d 972 (1996).

Applying this standard of review to the defendant's claim, we first consider that the trial court instructed the jury to disregard Fields' statement as to her belief that the defendant was an alcoholic. We generally presume, in the absence of evidence to the contrary, that the jury has followed the court's instructions. *State* v. *Parrott*, 262 Conn. 276, 294, 811 A.2d 705 (2003); *George* v. *Ericson*, 250 Conn. 312, 328, 736 A.2d 889 (1999). Only when the risk of prejudice is so obvious and overwhelming do we eschew such a presumption. See *State* v. *Delgado*, 243 Conn. 523, 549, 707 A.2d 1 (1998) ("some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored" [internal quotation marks omitted]); *State* v. *Horne*, 215 Conn. 538, 552–53, 577 A.2d 694 (1990) (recognizing instances when evidence is so inflammatory that it would be fiction to believe juror could put aside evidence heard). In the present case, we cannot conclude that Fields' comment was of the sort that would give rise to such serious prejudice. Fields had no expertise on alcoholism and demon-

strated no personal knowledge on which to base her conclusion.

The defendant contends, however, that Fields' statement, when viewed together with McPherson's report, resulted in overwhelming prejudice. Both pieces of evidence addressed the subject of whether the defendant had a prior history of heavy drinking. Nonetheless, even if we were to assume without deciding that McPherson's report improperly was admitted; see part II of this opinion; we conclude, for the same reasons that we previously concluded that the trial court's admission of McPherson's report was not harmful, that the overwhelming evidence of the defendant's intoxication on the night of the incident demonstrates that any prejudice that may have resulted did not deprive the defendant of a fair trial. Therefore, the trial court properly denied the defendant's motion for a mistrial.

## IV

We next address the defendant's claim that the trial court improperly instructed the jury on reasonable doubt. Specifically, he contends that the instructions impermissibly lowered the state's burden of proof, thereby depriving him of a fair trial. The defendant points to ten statements made by the trial court as improper, but concedes that this court and the Appellate Court previously have upheld all or part of each of the allegedly improper statements. Nonetheless, he contends that, when viewed as a whole, the instructions were improper. Alternatively, the defendant asks that we reconsider our prior cases upholding these instructions.

We decline the defendant's invitation to revisit our prior decisions on this matter. Moreover, we conclude, on the basis of well established case law that requires consideration of jury instructions in their totality; *State* v. *Davis*, 261 Conn. 553, 564, 804 A.2d 781 (2002); *State*

v. *Valinski,* 254 Conn. 107, 119, 756 A.2d 1250 (2000); that the instructions were not improper.

V

Finally, we consider the defendant's claim that he cannot be convicted of both manslaughter in the first degree in violation of § 53a-55 (a) (3), and manslaughter in the second degree with a motor vehicle in violation of § 53a-56b, for the death of one person. The defendant contends that the legislature clearly demonstrated its intent that § 53a-56b, the more specific statute, prevail over § 53a-55 (a) (3), the more general statute, and, accordingly, that his conviction under § 53a-55 (a) (3) must be set aside. The defendant also contends that the dual convictions violate his right against double jeopardy and his right to equal protection and due process. We disagree.

A

We first address the defendant's contention regarding legislative intent. Consistent with our well established jurisprudence on statutory construction, we begin with the language of the statute. *Connelly* v. *Commissioner of Correction,* 258 Conn. 394, 403, 780 A.2d 903 (2001); *State* v. *Pieger,* 240 Conn. 639, 646, 692 A.2d 1273 (1997). We first note the absence of any language in § 53a-56b to indicate expressly that the legislature intended that a person convicted of second degree manslaughter with a motor vehicle could not also be convicted of first degree manslaughter. By contrast, however, our Penal Code is replete with other statutes in which the legislature expressly has barred conviction of two crimes for one action. See, e.g., General Statutes § 53a-55a (a) ("[n]o person shall be found guilty of manslaughter in the first degree and manslaughter in the first degree with a firearm upon the same transaction"); General Statutes § 53a-59a (b) ("[n]o person shall be found guilty of assault in the first degree and assault of an elderly,

blind, disabled, pregnant or mentally retarded person in the first degree upon the same incident of assault"); General Statutes § 53a-59b (b) ("[n]o person shall be found guilty of assault in the first degree and assault of an employee of the Department of Correction in the first degree upon the same incident of assault"); General Statutes § 53a-72b (a) ("[n]o person shall be convicted of sexual assault in the third degree and sexual assault in the third degree with a firearm upon the same transaction"); General Statutes § 53a-92a (a) ("[n]o person shall be convicted of kidnapping in the first degree and kidnapping in the first degree with a firearm upon the same transaction"). In view of this common practice, we ordinarily presume that the legislature's failure to include such terms in § 53a-56b indicates that it did not intend a similar result. See *Commissioner of Transportation* v. *Kahn*, 262 Conn. 257, 273, 811 A.2d 693 (2003); *State* v. *McMahon*, 257 Conn. 544, 558–61, 778 A.2d 847 (2001), cert. denied, 534 U.S. 1130, 122 S. Ct. 1069, 151 L. Ed. 2d 972 (2002).

Moreover, contrary to the defendant's contention, nothing in the legislative history of § 53a-56b clearly evinces a different intention. The legislative history merely indicates the legislature's intent to enhance the existing criminal penalties for causing physical injury or death when driving while intoxicated in order to deter such conduct. See 25 H.R. Proc., Pt. 9, 1982 Sess., pp. 2771–72; 25 S. Proc., Pt. 11, 1982 Sess., p. 3645. As part of those reforms, the legislature changed the crime for causing a death when driving while intoxicated from what was then a class D felony—misconduct with a motor vehicle—to a class C felony, and increased the penalty to a possible ten years imprisonment. See Public Acts 1982, No. 82-403. There is nothing in this history to indicate whether, prior to the enactment of this provision, a person could have been convicted only of misconduct with a motor vehicle, even if the elements

of first degree manslaughter were satisfied. Moreover, there was no discussion as to whether convictions for both second degree manslaughter with a motor vehicle and first degree manslaughter were permissible or impermissible. Therefore, we are left with silence on the issue, from which we do not determine legislative intent. *Spears* v. *Garcia*, 263 Conn. 22, 34–35, 818 A.2d 37 (2003); *Dept. of Social Services* v. *Saunders*, 247 Conn. 686, 706, 724 A.2d 1093 (1999).

## B

Because we conclude that the defendant's statutory claim fails, we address his constitutional claims. See *Stamford Hospital* v. *Vega*, 236 Conn. 646, 663, 674 A.2d 821 (1996) (constitutional issue reached only if necessary); *Bauer* v. *Waste Management of Connecticut, Inc.*, 234 Conn. 221, 230, 662 A.2d 1179 (1995) (same). The defendant first contends that his convictions of both first degree manslaughter under § 53a-55 (a) (3) and second degree manslaughter with a motor vehicle under § 53a-56b violate his right against double jeopardy. We disagree.

"Traditionally we have applied the *Blockburger* test to determine whether two statutes criminalize the same offense, thus placing a defendant prosecuted under both statutes in double jeopardy: '[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.' *Blockburger* v. *United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932). 'This test is a technical one and examines only the statutes, charging instruments, and bill of particulars as opposed to the evidence presented at trial.' " *State* v. *Nixon*, 231 Conn. 545, 550–51, 651 A.2d 1264 (1995); accord *State* v.

*Miranda,* 260 Conn. 93, 125, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002).

To convict the defendant of first degree manslaughter, the state must prove that the defendant (1) "recklessly engage[d] in conduct" that (2) "create[d] a grave risk of death to another person," and (3) while acting "under circumstances evincing an extreme indifference to human life," (4) "cause[d] the death of another person." General Statutes § 53a-55 (a) (3);[18] see *State* v. *McMahon,* supra, 257 Conn. 567–68. To convict the defendant of second degree manslaughter with a motor vehicle, the state must prove that the defendant (1) "operat[ed] a motor vehicle" (2) while "under the influence of intoxicating liquor or any drug or both" and (3) "cause[d] the death of another person," and (4) that such death resulted "as a consequence of the effect of such liquor or drug." General Statutes § 53a-56b (a).[19] The substitute information with which the defendant was charged essentially mirrored the language set forth in the statutes. It is apparent by comparison of the statute and information on each charge that each offense requires proof of elements that the other does not. It is irrelevant that the state may have relied on the same evidence to prove that the elements of both statutes were satisfied. *State* v. *Nixon,* supra, 231 Conn. 550–51. Consequently, we conclude that it is possible to prove one offense in the manner charged in the information without necessarily proving the other offense.

Our analysis of double jeopardy claims does not end, however, with a comparison of the offenses. "The *Blockburger* test is a rule of statutory construction, and because it serves as a means of discerning [legislative] purpose the rule should not be controlling where, for

---

[18] See footnote 2 of this opinion for the full text of § 53a-55 (a) (3).

[19] See footnote 3 of this opinion for the full text of § 53a-56b.

example, there is a clear indication of contrary legislative intent." (Internal quotation marks omitted.) *State v. Miranda*, supra, 260 Conn. 127; *State v. Nixon*, supra, 231 Conn. 555. For the same reasons that we previously set forth in part V A of this opinion, we conclude that the legislature did not evince a clear intention that, even when the elements of first degree manslaughter can be satisfied, a defendant may be charged *only* with second degree manslaughter with a motor vehicle. Therefore, we reject the defendant's double jeopardy claim.

The defendant next contends that the convictions violate his right to equal protection and due process. He contends that "every other reported case . . . involving comparable facts" involved only a prosecution for second degree manslaughter.[20] He further contends that no reasonable person would have been on notice that he could be prosecuted for first degree manslaughter under the circumstances of the present case. We conclude that these claims are without merit.

The defendant does not contend that any fundamental right is implicated by this claim; accordingly, we review the statutory scheme to determine if there is any rational basis to support the scheme. *State v. Jason B.*, 248 Conn. 543, 559, 729 A.2d 760, cert. denied, 528 U.S. 967, 120 S. Ct. 406, 145 L. Ed. 2d 316 (1999). We first note that the defendant has failed to demonstrate that he is "similarly situated" to the defendants in the cases he cited in his brief who were charged only with the lesser offense. Moreover, decisions by the state's attorneys as to the offenses with which they will charge a defendant require inherently fact intensive inquiries.

---

[20] Nonetheless, the defendant noted one case in his brief in which a defendant was prosecuted for first degree manslaughter, but claims that the difference in the facts of that case from those in his case demonstrates a situation in which § 53a-55 rationally can be applied. See *State v. Shine*, 193 Conn. 632, 633–34, 479 A.2d 218 (1984).

We will not second guess the rationality of those decisions in the absence of persuasive reasons for doing so.

Second, with respect to the defendant's due process claim, we disagree that a reasonable person would not be on notice that he or she could be convicted of first degree manslaughter under the circumstances of the present case. This court previously has explained the meaning of the elements of § 53a-55 (a) (3). See *State* v. *McMahon*, supra, 257 Conn. 553–54 (explaining meaning of "extreme indifference to human life" and "grave risk of death"); *State* v. *Shine*, 193 Conn. 632, 643, 479 A.2d 218 (1984) (first degree manslaughter conviction affirmed for defendant who caused death of two persons when driving while intoxicated). We conclude, consistent with our prior case law, that a reasonable person would be on notice that these requirements are satisfied when, like in the present case, a person gets into his or her vehicle after consuming *excessive* quantities of alcohol, drives that vehicle for a considerable distance in the wrong direction at high rates of speed on major thoroughfares and hits another vehicle head-on, thereby killing another person. Cf. *State* v. *Bunkley*, 202 Conn. 629, 634–35, 642, 522 A.2d 795 (1987) (rejecting defendant's claim that § 53a-55 [a] [3] "did not give him fair warning as to when his conduct became reckless as opposed to criminally negligent"; affirming conviction for second degree manslaughter for death resulting from automobile accident when, while evading police pursuit, defendant had driven at excessive rate of speed, improperly passed other vehicles, disregarded traffic signals, and drove on wrong side of road).

The judgment is affirmed.

In this opinion the other justices concurred.