# STATE OF CONNECTICUT *v.* JAMES E. WALKER
## (AC 33550)

Beach, Alvord and Bear, Js.

Argued September 24—officially released December 10, 2013

*Matthew Eagan*, certified legal intern, with whom were *Timothy H. Everett*, assigned counsel, and, on the brief, *Randall Blowers*, *Matthew Loftus* and *Claire M. Howard*, certified legal interns, for the appellant (defendant).

*Nancy L. Walker*, special deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Stacey Haupt Miranda*, assistant state's attorney, for the appellee (state).

*Opinion*

BEAR, J. The defendant, James E. Walker, appeals from the judgment of conviction, rendered after a jury trial, of one count of conspiracy to commit assault in

the first degree in violation of General Statutes §§ 53a-59 (a) (5) and 53a-48. On appeal, the defendant claims: (1) there was insufficient evidence to support his conviction because the evidence rested entirely on the testimony of a jailhouse informant, (2) the court erred in excluding the defendant from a critical stage of the proceeding when trial counsel's possible conflict of interest was discussed in chambers, and it then failed to conduct an adequate inquiry on the record into the possible conflict before asking the defendant if he had an objection, and (3) the court improperly permitted the state to introduce testimony regarding latent fingerprint evidence despite the loss of such evidence while in police custody. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Ron Alex James and the defendant were longtime friends. The defendant also knew James' girlfriend, Jamie Walker. On September 12, 2005, Jamie Walker rented a gray 2005 Ford Focus. She gave the rental company two telephone numbers, one of which was 203-535-6997. That telephone number, however, was registered to Elizabeth Tyson, James' mother, who informed police that James used a cell phone that was associated with that number, and that this was James' contact number. On September 20, 2005, at 1:29 a.m., a two minute call was placed from James' cell phone to 203-535-8869, the number of the telephone that was used by the defendant.

Also on September 20, 2005, just before 2 a.m., Shaniya Bell was looking out of a second floor window in her apartment on Sherman Parkway in New Haven when she saw two African-American males, approximately five feet, nine inches, or five feet, ten inches, walking toward the parking lot of her building. One of the men was wearing blue shorts and the other was wearing blue pants. She saw one of the men remove a

silver and black gun from the back of his pants. Bell dialed 911. One of the men then went back up the road to a parked gray Ford Focus, entered the vehicle and moved it forward. Both men then ran across the parking lot of Bell's building, heading toward Dixwell Avenue. Still on the telephone with 911, Bell heard several gunshots and saw the same two men run back through the parking lot, back to the gray Ford Focus. The men then proceeded to make a U-turn in the vehicle and head south on Sherman Parkway.

In the meantime, Robert Pouncey and his friend, Chacarra Stevens, were lying on a bed in a first floor apartment, located at 429 Dixwell Avenue, that Pouncey shared with his mother, brother and five year old daughter, when Pouncey heard metal clicking outside of his bedroom window. There then was a series of more than ten gunshots, and both Pouncey and Stevens were hit by several bullets and sustained life-threatening or major injuries. Neither of them saw the shooter or shooters through the window, which had a fan in it. Pouncey's mother, who was home at the time of the shooting, called the police. On the ground below the window, police found seven shell casings that had been ejected from a semiautomatic weapon. They also found five fired bullets inside the bedroom.

Officer Robert Levy was in his police cruiser when he received a dispatch regarding the shooting, and he learned that Officer George Smith was attempting to stop a vehicle that the police believed may have been involved in the shooting. Levy drove to the intersection of Munson and Crescent Streets, where Smith had pulled over a gray Ford Focus. As the officers approached the vehicle, the vehicle sped off. The officers then engaged in pursuit of the vehicle, but lost sight of it. Other officers also had been called to help with the pursuit of the Ford Focus, when Officer George Baker and Officer Sherie Biros saw a black and red

baseball cap in the middle of Diamond Street, which later proved to contain, inter alia, James' DNA. As they stopped to pick up the cap, they saw a gray Ford Focus parked in the driveway of 55 Diamond Street. The car was the same vehicle that Jamie Walker, James' girlfriend, had rented on September 12, 2005. Officers Levy and Smith arrived at the scene and found two cell phones in the Ford Focus, one of which was associated with the number 203-535-6697, James' number. The owner of 55 Diamond Street did not know to whom the gray Ford Focus belonged, nor had he seen the car in his driveway prior to the police knocking on his door during the early morning hours of September 20, 2005.

The Ford Focus was towed to the police garage and was examined for prints. Some of the prints found on the outside of the vehicle belonged to James; one of the prints lifted from the front passenger side front door belonged to the defendant. The police also conducted an investigation of the area around where the Ford Focus was found. The police discovered a sneaker, which appeared new, in front of a wooden fence, and there were blue fibers on top of the fence, which indicated to police that the suspects had climbed the fence in an attempt to escape. In an area on the other side of the fence, they found a loaded Beretta nine millimeter semiautomatic pistol, which later was determined to be the same pistol that had discharged seven shell casings and some of the bullets found at Pouncey's home. Police were not successful in obtaining DNA from the Beretta, but the sneaker contained DNA, of which the defendant proved to be a major contributor. The police arrested the defendant.

James Dickerson, an acquaintance of the defendant, who was incarcerated in the same facility as the defendant, told police that the defendant admitted to him his involvement in the shootings on Dixwell Avenue. Dickerson testified at the defendant's trial that he had

come forward with this information in the hope of getting favorable consideration on his pending drug charges. He testified that the defendant had told him that he and James had gone to Pouncey's house in a car belonging to James' girlfriend in order to seek revenge against Pouncey for having robbed him. He further testified that the defendant had told him that both he and James had fired guns through Pouncey's bedroom window at Pouncey and his female friend, that they had fled in the car after the shooting and that they had abandoned the car thereafter.

Following the trial, the jury found the defendant guilty of one count of conspiracy to commit assault in the first degree. The jury, however, found the defendant not guilty of assault in the first degree, pursuant to § 53a-59 (a) (5), as either an accessory or as a principal. The defendant received a sentence of nineteen years incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant claims that there was insufficient evidence to sustain his conviction because the evidence against him consisted primarily of the testimony of Dickerson, a jailhouse informant. Relying on *State* v. *Sanchez*, 204 Conn. 472, 528 A.2d 373 (1987) (recognizing vitality of one witness plus corroboration rule to prove perjury), the defendant argues that, "as in perjury prosecutions, prosecutions that rely centrally on evidence given by a jailhouse informant in exchange for consideration in his own case should be recognized as a like exception to the general rule that one witness is enough to prove an element of a crime." The state argues that the defendant's claim has no legal support whatsoever, and, moreover, that Dickerson's testimony, in fact, "*was* corroborated in several important

respects." (Emphasis in original.) We conclude that the defendant's claim lacks merit.

"As a preliminary matter, we set forth the applicable standard of review. In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Butler*, 296 Conn. 62, 76, 993 A.2d 970 (2010).

In this case, the defendant agrees that this is our traditional standard of review, and he does not contest that the state met its burden of proof under our two part sufficiency of the evidence test. He argues, however, that we should adopt a "one witness plus corroboration" rule in cases where the testimony of a jailhouse informant is the central piece of evidence offered by the state, much like our Supreme Court has done in cases involving perjury. See *State* v. *Sanchez*, supra, 204 Conn. 477–78. The defendant cites to no case in Connecticut or in any other jurisdiction where this rule has been extended in the manner he requests. He merely argues that "[t]he jury should not have been permitted to reach [a guilty verdict] in the absence of corroborating evidence." We decline the defendant's invitation to change our law, and, in the absence of any argument that the evidence was insufficient under our traditional two part test, we conclude that this claim does not merit further discussion.

## II

The defendant next claims that the court erred in excluding him from a critical stage of the proceeding when trial counsel's possible conflict of interest was

discussed in chambers, and the court then failed to conduct an adequate inquiry on the record into the possible conflict before asking the defendant if he had any objection to counsel continuing to represent him. The defendant asks that we review these related unpreserved claims pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[1] or that we invoke the plain error doctrine.[2] See Practice Book § 60-5. We conclude that the defendant has not established that he is entitled to relief either under *Golding* or the plain error doctrine.

The following additional facts are necessary for our consideration of the defendant's claims, which will be considered separately. On the morning of October 25, 2010, the following colloquy occurred:

"The Court: Good morning, everybody. We are back to jury selection in [the present case]. The attorneys

[1] "Under *Golding* . . . a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Internal quotation marks omitted.) *State* v. *Collins*, 299 Conn. 567, 596, 10 A.3d 1005, cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011).

[2] Our Supreme Court has explained: "The plain error doctrine is a rule of reversibility reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . [Thus, an appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Citation omitted; internal quotation marks omitted.) *State* v. *Roger B.*, 297 Conn. 607, 618, 999 A.2d 752 (2010).

have brought a matter to the court's attention this morning which should be put on the record. [Attorney Stacey] Haupt [the prosecutor], I don't know if you want to go first or—

"[The Prosecutor]: That's fine. [Something] was brought to my attention . . . by Attorney Jack Doyle [regarding] the [plea] agreement between . . . Dickerson and the state's attorney office. . . . Attorney Doyle realized that Attorney [Richard] Silverstein [defense counsel] . . . had spoken to Mr. Dickerson at the request of Attorney Jamie Alosi to try to talk to him about taking some type of deal. However, it was prior to Mr. Dickerson cooperating in this case. I don't believe that deal came to fruition, but I just thought it should be brought to the court's attention . . .

"The Court: All right.

"[The Prosecutor]: . . . Attorney Silverstein in some respect had conversations with one of the state's witnesses.

"The Court: Let me flush that out a bit. Apparently, Mr. Dickerson, and it's already a matter of knowledge and public record in this case, is going to testify against [the defendant]. Mr. Dickerson, and I think you put this on the record earlier, and if not, it should be. Mr. Dickerson was on trial in front of this court, represented by Attorney Alosi. At some point, he entered a plea upstairs, and I had nothing to do with the plea. I had nothing to do with the sentencing. My involvement was picking a jury up to the point where the matter was resolved. Apparently, [Attorney] Silverstein, you can add to that factual situation. Listen up, Mr. Walker, I just want to make sure you understand this.

"[Defense Counsel]: Mr. Dickerson was brought in to begin jury selection in a matter which he eventually pled guilty to and is seeking to have consideration for

based on his testimony or anticipated testimony in this case. I happen[ed] to be on the sixth floor. He was in the bullpen upstairs with his attorney, and his attorney, who I know, had told me about the case he was proceeding to trial on. . . . [I]t was a sale case, and she had indicated to me that the sale that Mr. Dickerson was accused of making was captured on videotape and she showed me a photograph of what I believe was Mr. Dickerson. So, she [asked] me . . . [if I would] talk to him, so I did. I may have even volunteered. I know Mr. Dickerson. So, I went in and [spoke] to him and I said, I hear you're going to trial. He said, yes. I said, I hear they've got you on video. He says, it's not me. I said, well, here's the photograph, the still photo from the videotape. It sure looks like you, to me. He says, it's not me. I said, well, what was your offer. He explained to me what the plea [offer] was that he could accept short of going to trial.

"I was also aware that he had been on parole at the time of the arrest, and he was essentially doing dead time if there was not some provision in the anticipated plea agreement that would be good time back to the day of the arrest. I believe his lawyer told me that that was part of the [plea offer], that he would receive credit [from] the day of the arrest. I said to him . . . you have almost two years in on this matter, they're offering you three. I think, or three and a half. I don't really recall. But I believe it was anticipated that a plea on a charge assuming he took the plea [offer] . . . would result in maybe six months or nine months more of incarceration. He said he wasn't taking it.

"I said to him, I believe you've got a prior sale, and they're going to probably charge you sale by a nondrug-dependent person, sale within 1500 feet of a housing project, day care or school. I explained to him that everywhere in New Haven fits that definition. I said, if they charge you with possession—well, they wouldn't

charge you with possession. Those two charges alone, as a subsequent offender, he's looking at a minimum of eight years of incarceration that would have to run consecutive to the parole that was almost over.

"Given his prior history, I told him if he went to trial and was unsuccessful, he would probably receive double-digit time. He said he didn't care. I said, you're a big boy. It's your decision. I didn't tell him to take the [offer]. I didn't go over the evidence other than to say I viewed a photograph, a still photograph, of the videotape of the sale. I told him, if it wasn't him, it was a pretty good look-alike.

"I said, you're also going to have testimony from the police officer, the cooperating witness that it was, in fact, you. I said, in my opinion, the evidence was substantial. Then again, I didn't spend more than five or six minutes with him, nor did I, other than the layout, which he probably already heard from his attorney, have anything that would impact on [the] decision he made. Then he proceeded to come down here and begin jury selection with Your Honor.

"Subsequent to that, it would appear, and I didn't know until, let's say, a month to six weeks after that he had given that statement because it wasn't being handled by [the prosecutor] at that time, this case. . . .

"My client was incarcerated, having not made bond, and, at some point . . . I became aware that Dickerson had made a statement. As soon as I became aware, I asked [the prosecutor] to send me a copy of that statement. . . . I spoke to them about the parameters of the new plea agreement that Mr. Dickerson had entered into based on his cooperation and I was told essentially what happened. I was given a copy of the statement, and that's where we are today. My client is aware I had a limited interaction with Mr. Dickerson prior to him

giving inculpatory evidence or [an] anticipated statement that inculpates him, and I explained to [the defendant] that this in no way would impede my cross-examination of Mr. Dickerson. I don't think that that conversation is probably relevant to the deal he eventually entered into, and I would probably not, in my cross-examination, unless it came out that we knew each other, but we had known each other prior to me speaking to him up in court, and I wouldn't get into any details of the conversation. I don't think that would hamper my cross-examination of him at all. [The defendant] has indicated to me that he wants me to continue to represent him.

"The Court: You heard that, Mr. Walker? You're comfortable with that?

"The Defendant: Yes, yes.

"The Court: Let me tell you what I'm concerned about to protect your rights. As your lawyer, [Attorney] Silverstein owes you a duty of undivided loyalty. He can't represent two people at the same time that have any kind of conflict. From what I've heard here today, I haven't seen any. Whatever he did with Mr. Dickerson was unrelated to whatever deal Mr. Dickerson now has going, and he can go after that deal hand and claw, and there's nothing that I can see in his prior contact with Mr. Dickerson that is even relevant to the situation that developed after he spoke to [Attorney] Silverstein. I don't see any conflict. I don't see any violation of the law by [Attorney] Silverstein, and I want to make sure you're comfortable with it so we can get on with the trial, and you've got to let me know. Are you okay with it?

"The Defendant: Yes.

"The Court: Good, all right, then we'll pick it up. Let's bring the panel out. Thank you."

## A

The defendant argues that the "trial court's in-chambers inquiry into defense counsel's possible conflict of interest violated the defendant's right to be present at all critical stages of the prosecution, thus necessitating a new trial." The state responds that the record is not adequate for us to review this claim because it does not contain any information that would confirm that a chambers' conference actually occurred, what it entailed if it did occur, or whether it constituted a critical stage of the proceedings. It argues that "the record does not disclose whether the court and attorneys engaged in *any* significant conversation outside of the defendant's presence." (Emphasis in original.) We agree with the state.

"We begin with a fundamental tenet of criminal jurisprudence: a criminal defendant has a constitutional right to be present at all critical stages of his or her prosecution. *Rushen* v. *Spain,* 464 U.S. 114, 117, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983) (the right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant). Indeed, [a] defendant's right to be present . . . is scarcely less important to the accused than the right of trial itself. . . . *State* v. *Simino,* 200 Conn. 113, 127, 509 A.2d 1039 (1986). Although the constitutional right to be present is rooted to a large extent in the confrontation clause of the sixth amendment, courts have recognized that this right is protected by the due process clause in situations [in which] the defendant is not actually confronting witnesses or evidence against him. *Snyder* v. *Massachusetts,* 291 U.S. 97, 105–106, 108, 54 S. Ct. 330, 78 L. Ed. 674 (1934); see *State* v. *Jarzbek,* 204 Conn. 683, 691–92, 529 A.2d 1245 (1987) (recognizing that right to be present similarly is guaranteed by article first, § 8, of our state constitution), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982

(1988)." (Internal quotation marks omitted.) *State* v. *Lopez*, 271 Conn. 724, 732, 859 A.2d 898 (2004).

"In *State* v. *Sam*, 98 Conn. App. 13, 23, 907 A.2d 99, cert. denied, 280 Conn. 944, 912 A.2d 478 (2006), we noted that 'an in camera inquiry regarding a potential conflict of interest *may* constitute a critical stage of a prosecution at which . . . a defendant has a constitutional right to be present.' . . . Nevertheless, it does not follow that all in-chambers discussions constitute a critical stage of the prosecution. In *State* v. *Lopez*, [supra, 271 Conn. 724], our Supreme Court stated that '[i]n judging whether a particular segment of a criminal proceeding constitutes a critical stage of a defendant's prosecution, courts have evaluated the extent to which a fair and just hearing would be thwarted by [the defendant's] absence or whether his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.' . . . Id., 732; see also *State* v. *Holbrook*, 97 Conn. App. 490, 494–95, 906 A.2d 4, cert. denied, 280 Conn. 935, 909 A.2d 962 (2006); *State* v. *McNellis*, 15 Conn. App. 416, 431–32, 546 A.2d 292, cert. denied, 209 Conn. 809, 548 A.2d 441 (1988). It further noted that a defendant may be afforded the right either to object or to waive an objection to his absence from a conference held in chambers if the existence of such a conference subsequently is placed on the record. *State* v. *Lopez*, supra, 737 n.13." (Emphasis altered.) *State* v. *Hazel*, 106 Conn. App. 213, 220, 941 A.2d 378, cert. denied, 287 Conn. 903, 947 A.2d 343 (2008). "Applying the test set forth in *Lopez* to determine whether a particular in camera proceeding qualifies as a critical stage of the prosecution is a necessarily fact intensive inquiry. Thus, it is imperative that the record reveal the scope of discussion that transpired." (Internal quotation marks omitted.) *State* v. *Chambers*, 296 Conn. 397, 412–13, 994 A.2d 1248 (2010).

In the present case, our thorough search of the record reveals no information as to whether a meeting occurred in chambers or whether there was a discussion in court off the record in the presence or absence of the defendant, whether or how counsel alerted the court clerk's office that something needed to be put on the record that morning, or whether the attorneys did something else in the presence or absence of the defendant to alert the court that there was an issue that needed to be put on the record. We are unable to speculate on the occurrence or nonoccurrence of an in-chambers conference or an in-court conference in or out of the presence of the defendant. As our Supreme Court explained in *Chambers*, as the result of the failure of the defendant to supply us with a factual record establishing any or some of the foregoing possible scenarios, "we cannot determine the extent to which a fair and just hearing would have been thwarted by the defendant's absence or whether his presence has a reasonably substantial relation to the fullness of his opportunity to defend against the criminal charges." (Internal quotation marks omitted.) Id., 413; see also *State* v. *Bonner*, 290 Conn. 468, 492–93, 964 A.2d 73 (2008) (claim inadequate for review where defendant failed to provide factual record to support claim that in-chambers discussion regarding potential conflict of interest occurred at critical stage of proceeding, outside of defendant's presence).

The failure of the defendant to request a hearing before the trial court to establish a factual predicate for appellate review of this claim renders the record inadequate for any meaningful review. "[I]t is incumbent upon the [defendant] to take the necessary steps to sustain [his] burden of providing an adequate record for appellate review. . . . Our role is not to guess at possibilities . . . but to review claims based on a complete factual record developed by a trial court. . . .

Without the necessary factual and legal conclusions furnished by the trial court . . . any decision made by [any appellate court] respecting [the defendant's claims] would be entirely speculative. . . . *State* v. *Canales*, 281 Conn. 572, 583–84, 916 A.2d 767 (2007); see also *State* v. *Dalzell*, 282 Conn. 709, 720, 924 A.2d 809 (2007) (for any *Golding* claim, incumbent on defendant to take necessary steps to sustain burden of providing adequate record for appellate review); *State* v. *Brunetti*, 279 Conn. 39, 63, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007)." (Internal quotation marks omitted.) *State* v. *Hazel*, supra, 106 Conn. App. 221–22.

Accordingly, we will not speculate about the constitutional implications of any alleged discussions that may have taken place out of the defendant's presence, nor will we reverse the defendant's conviction and order a new trial on the basis of such speculation. We conclude that the defendant's claim is inadequate for review under *Golding* and does not warrant the invocation of the plain error doctrine.

B

The defendant also claims that the "trial court did not conduct an adequate inquiry on the record into trial counsel's actual and active conflict of interest so as to make it possible for the defendant to understand and decide advisedly whether to waive his right to conflict-free counsel." The state argues that the "court adequately explored the possible conflict of interest and properly determined that no actual conflict existed that would adversely affect [Attorney] Silverstein's ability to represent the defendant." We agree with the state.

"We begin our analysis of the defendant's claim by setting forth the applicable standard of review. Almost without exception, we have required that a claim of ineffective assistance of counsel must be raised by way

of habeas corpus, rather than by direct appeal, because of the need for a full evidentiary record for such [a] claim. . . . On the rare occasions that we have addressed an ineffective assistance of counsel claim on direct appeal, we have limited our review to allegations that the defendant's sixth amendment rights had been jeopardized by the actions of the *trial court*, rather than by those of his counsel. . . . We have addressed such claims, moreover, only where the record of the trial court's allegedly improper action was adequate for review or the issue presented was a question of law, not one of fact requiring further evidentiary development. . . . We, therefore, review the defendant's claim as a question of law and, as with all questions of law, our review is plenary. . . .

"The sixth amendment to the United States constitution as applied to the states through the fourteenth amendment, and article first, § 8, of the Connecticut constitution, guarantee to a criminal defendant the right to effective assistance of counsel. . . . Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest. . . . [O]ne of the principal safeguards of this right is the rule announced by this court that [a trial] court must explore the possibility of conflict . . . when it knows or reasonably should know of a conflict . . . .

"There are two circumstances under which a trial court has a duty to inquire with respect to a conflict of interest: (1) when there has been a timely conflict objection at trial . . . or (2) when the trial court knows or reasonably should know that a particular conflict exists. . . . A trial court's failure to inquire in such circumstances constitutes the basis for reversal of a defendant's conviction. . . . In the absence of an affirmative duty by the trial court to inquire, however, a

defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance in order to obtain reversal of his conviction." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State v. Parrott*, 262 Conn. 276, 285–87, 811 A.2d 705 (2003).

"To safeguard a criminal defendant's right to the effective assistance of counsel, a trial court has an affirmative obligation to explore the possibility of conflict when such conflict is brought to the attention of the trial [court] in a timely manner. . . . In discharging this duty, the trial court must be able, and be freely permitted, to rely upon [defense] counsel's representation that the possibility of such a conflict does or does not exist. . . . The reliance in such an instance is upon the solemn representation of a fact made by [the] attorney as an officer of the court. . . . The course thereafter followed by the court in its inquiry depends upon the circumstances of the particular case." (Citations omitted; internal quotation marks omitted.) *State* v. *Drakeford*, 261 Conn. 420, 427, 802 A.2d 844 (2002).

In the present case, on the morning of October 25, 2010, the court stated that counsel had brought a matter to its attention that needed to be placed on the record. The state and Attorney Silverstein each addressed the court regarding Attorney Silverstein's previous discussion with Dickerson. The court also asked the defendant to pay attention to what was being discussed. After explaining his discussion with Dickerson to the court, Attorney Silverstein assured the court that his cross-examination of Dickerson in the present case would not be impeded by that previous discussion and that the defendant was aware of counsel's previous interaction with Dickerson, but wanted him to continue his representation. The court very clearly asked the defendant if he was comfortable with Attorney Silverstein continuing to represent him, and the defendant, very clearly,

said yes. The court then proceeded to explain to the defendant that, although it did not see a conflict, it was concerned about the defendant's rights and that Attorney Silverstein owed him a duty of loyalty. The court, again, asked the defendant if he was "okay" with Attorney Silverstein continuing to represent him, and the defendant, again, clearly said yes.

We conclude that the court's inquiry into the potential conflict of interest was sufficient under the circumstances presented. Attorney Silverstein told the court that he had discussed this matter with the defendant and that the defendant wanted him to continue representing him. The court also directly asked the defendant if he was comfortable with his attorney continuing to represent him, and the defendant, on two occasions, said yes. The defendant did not indicate in any way to the court that he was concerned that Attorney Silverstein's trial performance would be impeded by the prior interaction with Dickerson. Attorney Silverstein also assured the court that his brief interaction with Dickerson would not affect his cross-examination of Dickerson. The court, certainly, is permitted to rely on such representations of an officer of the court; *State* v. *Drakeford*, supra, 261 Conn. 427; see also *State* v. *Parrott*, supra, 262 Conn. 289; and the defendant's responses to its questions and statements. On the basis of the foregoing, we conclude that the court conducted a sufficient inquiry into counsel's potential conflict of interest in the presence of the defendant to ensure that his constitutional rights were not violated.

III

The defendant also claims that the court improperly permitted the state to introduce testimony regarding latent fingerprint evidence despite the loss of such evidence while in police custody. Specifically, he argues: "The defendant's right to confront his accusers and his

right to due process of law were violated because the state was permitted to offer testimony that a partial latent fingerprint on the outside of the 'getaway car' belonged to the defendant even though the print lifted from the car was lost, making it impossible for the defendant to hire his own analyst and impossible to cross-examine the state's witness effectively." The defendant further argues that the court "failed to apply the *Morales-Asherman* test to determine how to remedy the due process violation." See *State* v. *Morales*, 232 Conn. 707, 657 A.2d 585 (1995); *State* v. *Asherman*, 193 Conn. 695, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). The state argues that the defendant has abandoned his confrontation clause claim by failing to brief it on appeal and that there is an inadequate record to review his due process claim because he never made such a claim before the trial court, and the trial court, therefore, did not make the findings necessary to permit a proper review of the claim on appeal. After a thorough review of the record in this case, we agree with the state.

The following additional facts are relevant to our conclusion. During trial, on November 3, 2010, after the court released the jury for its afternoon break, the following colloquy occurred:

"The Court: All right, the jury's out and, at the request of counsel to expedite the evidence today, I think, excuse me, I think [defense counsel] wants to address something with respect to . . . Detective [George] Shelton, who is the—on tap to be the next witness in the case.

"[Defense Counsel]: Well, Your Honor, I became aware after reading the transcript of the first trial that the latent identifiable prints that were lifted were lost. You indicated when that was brought to your attention

at the first trial that that goes to weight and not admissibility. I'm claiming that it curtails my client's fifth amendment privilege to cross-examine on the accuracy of the identifications made by Detective Shelton[3] because, by losing the evidence, they made it impossible for me to conduct an independent examination of that evidence.

"The Court: Made it possible for you?

"[Defense Counsel]: Made it impossible for me to conduct—

"The Court: When did you make that request?

"[Defense Counsel]: I didn't make a request. I became aware that they were lost, so I'm moving, I mean, is there any question that I was given a transcript of the case some months ago? I'm saying now, it was lost then, it's been lost since 2005; I'm assuming that that's not a fact in dispute, that it's unavailable. And what would be the point of making a request for evidence that is unavailable that I know is unavailable? So, I'm operating under the assumption, and a correct one, that after 2005 that evidence is unavailable. I assume that had it been available I would have been told by the state, so I'm operating under the assumption that a year ago it was unavailable, and it's unavailable here today. And because it is unavailable, I can file all the requests I wanted to examine that evidence, but what would be the point? I was aware.

"The Court: How long has this case been pending, [the defendant's] case been pending?

"[Defense Counsel]: I assume since 2008. . . . I know it's unavailable, the court knows it's unavailable

---

[3] Contrary to defense counsel's statement, we note that the sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

a year ago, and the fact that it is unavailable made it impossible for me to do an independent test . . . on those latent fingerprints. . . . If you're saying that if the ruling comes down, had I made a request to view something I knew was unavailable and that makes my argument better, well, then, then, really, what you're saying is, by not making a request to see evidence I know is not available and [has] been lost, that it was my fault.

"The Court: I'm not casting fault anywhere, sir. . . . I'm just trying to get the chronology of things.

"[Defense Counsel]: You allow him to testify because he never claimed that he wanted to examine those fingerprints. I'm telling you it was impossible for me to examine the fingerprints. Had they been available, I would have.

"The Court: Your point is clear, sir.

"[Defense Counsel]: And, as we know, fingerprints, unlike DNA, is subject to interpretation. I'm given a report that doesn't even tell me how many points, identification points, he used when he did those comparisons. I'm just left with a conclusory report that says, yes, it's his fingerprint, not even how many points of identification. And the court is aware, having done this a long time, one of the things they do in fingerprint identification—

"The Court: How would the lifts themselves tell you what was the nature of the analysis conducted by Mr. Shelton because that's what's missing, is the lifts themselves, sir.

"[Defense Counsel]: And the lifts themselves would tell me how many points of comparison he used.

"The Court: How would that tell you what Mr. Shelton did when he made his analysis?

"[Defense Counsel]: Well, I mean, it would subject that analysis to interpretation if I provided my own expert who said . . . it wasn't. . . . And, look, I didn't lose the evidence, Your Honor. . . . Let's remember who's at fault if the evidence is not available.

"The Court: Sir, I'm listening to you. . . . And I'm not reaching any conclusions. I'm just trying to understand . . . what your argument is. . . . So far, the argument, as I understand it, correct me if I'm wrong, is that it's not your fault that the prints were lost, and you need them to satisfy your client's fifth amendment rights with respect to cross-examination.

"[Defense Counsel]: And I would have gone further. I don't even know how many points, if it was a five point, which is the minimum, right, as opposed to a nine point comparison. If there's a five point, then an expert would say no, I only see four points. That's deficient; there's a problem here with this identification.

"The Court: Okay.

"[Defense Counsel]: They can't hide the ball from me and then make the argument that you don't have the ball; therefore, you can't play. I mean, that's what they're—what they did in this case, and it's . . . and I should have asked to play even though I know the ball has been hidden.

"The Court: Are you done, sir?

"[Defense Counsel]: Yes.

"The Court: You're not suggesting that I am telling you that it's your fault that the prints were lost or that you didn't ask for them. You're not making that claim, are you?

"[Defense Counsel]: Well, I think that I want to be sure that if my claim falls for the fact that I didn't file a piece of paper asking for something I know is not

available for a comparison test . . . then that would be my fault.

"The Court: I don't think we're going to get there, sir. State?

"[The Prosecutor]: True that fingerprint lifts are lost and they were lost, as Your Honor knows, in the last trial. I don't know, however, how that affects what this person—what Detective Shelton did in order to compare them. All that stuff is great—ripe for cross-examination, but I don't think it prevents him from testifying about what he did with the lifts when he had them.

"The Court: "[Defense counsel]?

"[Defense Counsel]: Can I make one more point?

"The Court: You can after I ask my question. . . . Your claim is that all of the testimony of Shelton should be excluded?

"[Defense Counsel]: Right.

"The Court: All right, okay. Make your further claim.

"[Defense Counsel]: My last one, all right? . . . I talked to the—to my brain trusts, too, okay, on this matter, and I know that there are certain cases that say when something is used up during the examination, for instance, narcotics cases where there is just a, a residue, right, and it can't be tested.because it was used up during the testing process, they say, okay, it comes in. Sorry, we don't have any, you know, it's been used up so you can't test it. But this is something quite different. Fingerprints don't get used up, okay? Fingerprints stay in the condition they are when they're lifted. So, I guess the analogy I would make is, if you allow somebody to come in and say they did a ballistic examination of a projectile and said it was fired from that weapon and

not have the projectile itself, all right, and the defense made a request for that projectile to do an independent testing, I can't see a court allowing somebody to come in and say, here are my results. Sorry, we don't have the projectile, we lost it, sorry you can't test it independently to test our conclusions, because I can cross-examine this witness all I want, but absent that physical evidence, I'm stuck with a jury believing his conclusions because there's no way to test the credibility of that conclusion or the accuracy of that conclusion absent the jury comparing it themselves to the known and the unknown or absent having an expert do the same for us. I think it's a real problem, okay, and I'm doing this outside the presence of the jury because I do not think, given that there's DNA in this case, and that's another problem I have, Your Honor.

"The Court: Let's do the prints right now, sir.

"[Defense Counsel]: Okay. Given that there is DNA in the case, it's uncontroverted my client is a mixture, why do they need that? And I think that should go into your—

"The Court: Isn't it a different form of evidence, sir?

"[Defense Counsel]: I understand, but I think it should go into your decision as to whether or not the prejudicial effect of—against my client as to the probative effect and, in the inverse, the prejudices this will have against the state's case if you were to side with me. It's not fatal to their case.

"The Court: Done?

"[Defense Counsel]: Yes. . . . Something will come back. Something will come to me on the way home as I'm driving home but.

"The Court: All right, all right. And I mean that in all sincerity. Are you done with your argument?

"[Defense Counsel]: Yes. . . .

"The Court: All right, motion's denied, [defense counsel]. The factual basis, as I understand, is that [Detective William P.] Farrell took the prints, lifted—lifted the prints from the latent and then in some fashion gave them to Shelton. Shelton is the next witness who will testify about the examination that he made of the prints and the conclusions or findings that he made from his personal examination. I don't know of any rule, and I said this earlier, I don't know of any rule that would preclude Shelton from testifying about what he personally did and concluded based on his own involvement in the case. Clearly, the prints or the lifts are gone. That may go to the weight of his testimony, but in terms of admissibility, I don't think the law precludes his testimony.

"You've mentioned a number of ways in your argument as to questions that could be asked of the witness to undermine the credibility of his opinion. You can have ample cross-examination to undermine his testimony and the probative value of these prints. It's not duplicative evidence; it's different evidence from a different source in a different way; it's more probative than prejudicial; and to the extent you claim that it's duplicative because there's also DNA evidence against [the defendant] that undermines your argument of prejudice. For all those reasons, the objection is overruled and you have your record, sir.

"[Defense Counsel]: I did think of one thing. You say that . . . you could think of no rule of law. Well, it's a very basic rule: You cannot testify about something that is not in evidence, and that's the rule because in order for him to testify about the prints if the prints were available, the prints would have to be admitted, would they not? . . .

"The Court: Your cross-examination . . . rights are amply protected based on the examination you—I am sure you will conduct, sir. That completes my ruling. It's on the record. Let's take a five minute recess and pick it up with [Detective] Shelton."

Although the confrontation clause of the federal constitution was the basis for the defendant's objection before the trial court, on appeal, the defendant makes only a cursory claim that the admission of testimony concerning the latent fingerprint evidence would violate his rights under the confrontation clause. He provides no analysis, nor argument on this issue. Accordingly, we conclude that the defendant has failed to brief a federal confrontation clause claim on appeal. See *State v. Claudio C.*, 125 Conn. App. 588, 600, 11 A.3d 1086 (2010) ("[W]e are not required to review claims that are inadequately briefed. . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited. . . . [A]ssignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court." [Internal quotation marks omitted.]), cert. denied, 300 Conn. 910, 12 A.3d 1005 (2011).

The defendant, however, has briefed and analyzed a claim that the court violated his right to due process,

under article first, § 8, of the Connecticut constitution, by permitting testimony about the latent fingerprints, despite the loss of the actual prints while in police custody. He argues that the court improperly failed to conduct the *Morales-Asherman* balancing test before ruling that the testimony was admissible. We conclude that the defendant failed to raise this state due process claim before the trial court, and, although he requests *Golding* review; see *State* v. *Golding*, supra, 213 Conn. 239–40; we conclude that we do not have a sufficient record on appeal to consider this claim. See *State* v. *Medina*, 228 Conn. 281, 300, 636 A.2d 351 (1994) (although *Golding* review requested, because defendant did not clearly raise state constitutional claim before trial court, state not put on notice that it was required to defend against such claim, and, therefore, neither state nor trial court—nor court on appeal—had benefit of complete factual inquiry).

"In *State* v. *Morales*, [supra, 232 Conn. 720], our Supreme Court determined that article first, § 8, of the Connecticut constitution requires a balancing test rather than a showing of bad faith: We refer to this test as the *Asherman* test. [*State* v. *Asherman*, supra, 193 Conn. 724.] Although the United States Supreme Court in [*Arizona* v. *Youngblood*, 488 U.S. 51, 57, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988)] held that due process under the federal constitution does not require a trial court to apply such a balancing test . . . due process under our state constitution does. [T]he trial court must employ the [*Asherman*] balancing test, weighing the reasons for the unavailability of the evidence against the degree of prejudice to the accused. . . . *State* v. *Joyce*, 243 Conn. 282, 301, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998). The factors to be considered include [1] the

materiality of the missing evidence, [2] the likelihood of mistaken interpretation of it by witnesses or the jury, [3] the reason for its nonavailability to the defense and [4] the prejudice to the defendant caused by the unavailability of the evidence. *State* v. *Asherman*, supra, 724." (Internal quotation marks omitted.) *Jason B.* v. *Commissioner of Correction*, 141 Conn. App. 674, 676–77, 62 A.3d 1144 (2013).

A review of the record in the present case reveals that, because the defendant did not raise this claim before the trial court, the court did not make findings related to factors one, two or three, namely, the materiality of the missing evidence, the likelihood of the mistaken interpretation of it by witnesses or by the jury, or the reasons for the nonavailability of the evidence to the defense, including the good faith or bad faith of the police in losing the evidence. See id. Without the necessary findings, some of which require credibility determinations, we are unable to consider the defendant's claim on appeal. See *State* v. *Darden*, 239 Conn. 467, 469–71, 687 A.2d 132 (1996) (determination of *Asherman* factors requires factual findings).[4] Accordingly, the defendant's claim is not entitled to *Golding* review because the record is inadequate for review.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[4] Although our Supreme Court in *Darden* remanded the case to the trial court to hold an evidentiary hearing and to apply the *Asherman* balancing test, such a remand was appropriate in that case because the defendant had raised a state due process claim before the trial court, and the court had not conducted the necessary balancing test in light of then newly decided *State* v. *Morales*, supra, 232 Conn. 707. *State* v. *Darden*, supra, 239 Conn. 469–71. In the present case, the defendant never raised a state due process claim nor asked the court to apply the now well established *Asherman* factors. Accordingly, we conclude that it would be inappropriate to remand the case for an evidentiary hearing.