******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* STACY SMITH
(AC 37632)

DiPentima, C. J., and Mullins and Flynn, Js.

*Argued January 30—officially released June 27, 2017*

(Appeal from Superior Court, judicial district of
Hartford, Dewey, J.)

*Kevin M. Smith*, with whom, on the brief, were *Norman A. Pattis* and *Daniel M. Erwin*, for the appellant (defendant).

*Nancy L. Walker*, deputy assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Christopher Pelosi*, senior assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Stacy Smith, appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1) (count one), risk of injury to a child in violation of General Statutes § 53-21 (a) (2) (count two), sexual assault in the second degree in violation of § 53a-71 (a) (1) (count three), risk of injury to a child in violation of § 53-21 (a) (2) (count four), sexual assault in the fourth degree in violation of General Statutes § 53-73a (a) (1) (count five), risk of injury to a child in violation of § 53-21 (a) (2) (count six), and risk of injury to a child in violation of § 53-21 (a) (1) (count seven). On appeal, the defendant claims that (1) his conviction violated his right to due process under the constitution of Connecticut because the police lost potentially exculpatory evidence, in the form of a text message, in violation of *State* v. *Morales*, 232 Conn. 707, 720, 657 A.2d 585 (1995), and (2) his conviction for both sexual assault in the second degree (counts one and three) and risk of injury to a child (counts two and four) constituted a violation of his constitutional right against double jeopardy. We disagree and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The charged events occurred between October, 2007, and October, 2009, when the victim[1] was thirteen, fourteen and fifteen years old. At that time, she lived with her mother, M, two older brothers, and a younger sister. Until the end of 2009, the victim's family socialized "almost every weekend" with D, who was the victim's godmother and M's best friend, and D's sons. In 2006, the victim met the defendant for the first time at a Dunkin' Donuts store and learned that he was the father of D's oldest son. The defendant was thirty-seven or thirty-eight years old at the time, recently had finished serving a prison sentence for federal narcotics violations, and was living in a halfway house and working at Dunkin' Donuts. Shortly thereafter, the defendant and D resumed their previous relationship, and, in the winter of 2007, the defendant moved into D's East Hartford home.

In the summers of 2007, 2008 and 2009, the victim and her family regularly attended get-togethers at D's home with D, her sons, and the defendant. During that time, the victim also frequently babysat for D's younger son at D's house. On those occasions, the defendant would often be present. The defendant's inappropriate behavior toward the victim started in 2007, when the victim was socializing with D's family and babysitting at D's house. Specifically, between 2007 and 2008, the defendant began talking to the victim about sex, he would caress her calf while they were watching a movie, and he would show her "in his phone . . . other girls

he was messing with other than [D], telling [her] things that he would do with them and . . . what [she] should do with other guys if [she] was dating someone."

In 2008, the defendant began kissing and touching the victim while she was babysitting or attending social gatherings at D's house. The defendant put his fingers in her vagina and touched her breasts or buttocks multiple times between October, 2008 and October, 2009. On one occasion in the summer of 2008, the defendant performed oral sex on the victim while she was babysitting for D. Although the victim asked him to stop and tried to push him off of her, he continued for about thirty seconds and stopped when he heard D's car pull into the driveway. On several occasions when the defendant was kissing or touching the victim, he would unzip his pants and pull out his penis. Although the defendant asked the victim to perform oral sex on him two or three times, she refused, and he "laughed it off."

In 2010, the victim's family stopped socializing with D's family because the defendant "was getting abusive" with D, and M did not want her daughters "to be around all that arguing." The last time the victim saw the defendant was at a Fourth of July party at D's house in 2010, at which the defendant tried to pull the victim into a room and to kiss her, but she was able to escape.

In January, 2011, the victim told M about the defendant's actions. The next day, M took the victim to the East Hartford Police Department, where they met with Officer Daniel Zaleski. Zaleski spoke with the victim separately for about twenty minutes, during which time the victim disclosed the pertinent details about the defendant's repeated sexual conduct toward her. Zaleski then referred the case to a juvenile investigator, Detective Samuel Kelsey, who investigated sexual assaults involving minors, and reported the matter to the Department of Children and Families (department).

On February 1, 2011, after receiving a phone call from Kelsey requesting to speak with him about the allegations against him, the defendant voluntarily went to the East Hartford Police Department and gave a statement. According to Kelsey, the defendant admitted to having had "close contact" with the victim "in an inappropriate nature, [such] as touching her breast and vagina." Specifically, during this interview with Kelsey, the defendant "said at no time did he have sex with her; he said he was under the influence of alcohol and he can't remember all the events but he does admit having made contact with her; he said he was very sorry and that he would like to make amends in any way deemed necessary, this is not him . . . but that's no excuse." After Kelsey reduced the defendant's statement to writing, the defendant initialed and signed it. The entire interview lasted approximately forty minutes.

After the interview, in the lobby of the police station, the defendant was met by Betzalda Torres, an investigator employed by the department who was investigating the alleged physical neglect and sexual abuse of the victim by the defendant. After Torres reviewed the allegations against him involving the physical neglect and sexual abuse of the victim, for the purposes of the investigation by the department, the defendant "basically, confirmed that what [the victim] said was correct, did not deny it, and . . . [he] was feeling apologetic to the family for what he ha[d] done." The defendant told Torres that he had been sexually inappropriate with the victim and that he had had "many" discussions with her regarding sex and her virginity. During this interview, the defendant was not specific as to the details of the actual acts he preformed, but he explained that his alcohol and drug use played a role and he "took full responsibility" for being "sexually inappropriate toward [the victim]."

The defendant subsequently was arrested and, following a jury trial, was convicted of two counts of sexual assault in the second degree, four counts of risk of injury to a child, and one count of sexual assault in the fourth degree. The court, *Dewey*, *J.*, subsequently sentenced the defendant to a total effective sentence of thirty years incarceration, followed by five years of special parole. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that his conviction violated his right to due process under the constitution of Connecticut because the police lost potentially exculpatory evidence, in the form of a text message, sent from the defendant to M, in violation of *State* v. *Morales*, supra, 232 Conn. 707. Specifically, the defendant argues that because M showed the text message to Kelsey and Torres, the East Hartford police and the department were on notice of the existence of this "apologetic" text message, creating a duty to preserve the evidence, and that their failure to do so violated his right to due process under the state constitution.[2] The state counters that there is an inadequate record to review the defendant's due process claim because he never raised this issue before the trial court, and, therefore, the court did not make the findings necessary for us to review this claim. We agree with the state.

The following facts are relevant to our conclusion. At the defendant's trial multiple witnesses testified regarding the existence of a text message that the defendant sent to MT in February, 2011.[3] Specifically, while being cross-examined by defense counsel, M testified that the defendant sent her a text message that was a purported apology for his actions involving the victim.[4] During redirect examination by the prosecutor, M fur-

ther testified that she showed this text message to Kelsey and Torres, but that she did not have a copy of the text message because her phone had been damaged, and she no longer had that phone.

Kelsey also testified regarding the text message sent from the defendant to M while being cross-examined by defense counsel. Specifically, Kelsey testified that he had seen the text message that was a purported apology, but that he did not memorialize it or record it because he believed that there was probable cause to arrest the defendant based on the statements he made regarding the victim.[5]

During direct examination by the prosecutor, Torres also testified regarding the existence and contents of the text message. Torres explained that M showed her a text message she had received from the defendant that was apologetic in nature. Torres further testified that she did not save that text message or make a copy of it.[6]

In addition, Detective Frank Napolitano testified that he submitted an ex parte warrant to obtain M's cell phone records and that another detective obtained a search warrant to obtain the defendant's cell phone records. Napolitano further testified that the cell phone records indicated only that a text message had been sent from the defendant's cell phone to M's cell phone on the date in question, because too much time had lapsed for the cell phone company to be able to retrieve the contents of the text message.[7]

On appeal, the defendant claims that his conviction violated his right to due process, under article first, § 8, of the Connecticut constitution, because the police lost potentially exculpatory evidence in the form of a text message that he had sent to M. It is not disputed that the defendant did not raise his due process claim before the trial court, and, therefore, he seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). In *Golding*, our Supreme Court held: "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. . . . Id.; see also *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third prong of *Golding* by eliminating word clearly before words exists and deprived)." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Mark*, 170 Conn. App. 254, 264–65,     A.3d     (2017).

We conclude that we do not have a sufficient record on appeal to consider this claim. See *State* v. *Walker*, 147 Conn. App. 1, 28, 82 A.3d 630 (2013) ("although *Golding* review requested, because defendant did not clearly raise state constitutional claim before trial court, state not put on notice that it was required to defend against such claim, and, therefore, neither state nor trial court—nor court on appeal—had benefit of complete factual inquiry"), aff'd, 319 Conn. 668, 126 A.3d 1087 (2015).

The defendant's claim is based on the proposition that his conviction violated his right to due process under the constitution of Connecticut because the police lost potentially exculpatory evidence in the form of a text message that he sent to M, which M showed to Kelsey and Torres. "Therefore, we begin by noting that it is well established that there are two areas of constitutionally guaranteed access to evidence such that denying or foreclosing the defendant's access to that evidence may constitute a due process violation. The first situation concerns the withholding of exculpatory evidence by the police from the accused. . . . The second situation . . . concerns the failure of the police to preserve evidence that might be useful to the accused." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Johnson*, 288 Conn. 236, 275–76, 951 A.2d 1257 (2008). It is this second situation that the defendant claims is applicable in the present case.

"Despite these constitutional concerns, it is not sufficient under the federal or state constitution for a defendant simply to demonstrate that the police or the state has failed to preserve evidence. With respect to a due process violation for failure to preserve under the federal constitution, the United States Supreme Court has held that the due process clause of the fourteenth amendment requires that a criminal defendant . . . show bad faith on the part of the police [for] failure to preserve potentially useful evidence [to] constitute a denial of due process of law. . . . Notably, in [*Arizona* v. *Youngblood*, 488 U.S. 51, 57, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988)], the court observed that it had adopted a higher burden for defendants seeking to demonstrate a due process violation for failure to preserve evidence than that applicable to claims that the state has suppressed or withheld exculpatory evidence in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) (not requiring defendant to show bad faith to demonstrate due process violation). The court in *Youngblood* explained that it was unwilling to read the fundamental fairness requirement of the [d]ue [p]rocess [c]lause . . . as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.

"In [*State* v. *Morales*, supra, 232 Conn. 720], we rejected the federal bad faith requirement for claims alleging a failure to preserve in violation of our state constitution. Rather, we maintained that, in determining whether a defendant has been afforded due process of law under the state constitution, the trial court must employ the . . . balancing test [laid out in *State* v. *Asherman*, 193 Conn. 695, 724, 478 A.2d 227 (1984)], weighing the reasons for the unavailability of the evidence against the degree of prejudice to the accused. More specifically, the trial court must balance the totality of the circumstances surrounding the missing evidence, including the following factors: the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Johnson*, supra, 288 Conn. 276–77.

The defendant argues that the record is adequate for review of his due process claim because it reveals: "(1) cause to believe that the lost evidence existed and some reason to believe it would have helped the defendant; (2) that the evidence was in the state's custody at a relevant point in time; [and] (3) the circumstances of the loss or destruction of evidence."[8] The state first counters by arguing that the factors "the defendant has identified are merely some, but not all, of the considerations a trial court would balance in evaluating the four *Asherman* factors: materiality; likelihood of mistaken interpretation; reason for nonavailability to defense; and prejudice. . . . In particular, the defendant's factors do not include whether the missing evidence would likely be subject to misinterpretation, and whether its loss prejudiced the defendant." (Citation omitted.) The state continues by arguing that the first and the third factors the defendant identified are disputed and, therefore, "[t]o conclude that a verbatim copy of the text message would have helped the defendant, this court would have to resolve the conflicting testimony, which it cannot do on appeal."[9]

After our review of the record, we agree with the state. We iterate that because the defendant did not raise this claim before the trial court, the court did not make factual findings related to any of the *Asherman* factors. See *State* v. *Darden*, 239 Conn. 467, 469–71, 687 A.2d 132 (1996) (Supreme Court declined to apply *Asherman* factors for first time on appeal because determination of *Asherman* factors requires factual findings).[10] Without the necessary findings, we are unable to consider the defendant's claim on appeal. Accordingly, the defendant's claim is not entitled to *Golding* review because the record is inadequate for review. See *State* v. *Walker*, supra, 147 Conn. App. 28–29.

## II

The defendant next claims that his conviction for sexual assault in the second degree pursuant to § 53a-71 (a) (1)[11] (counts one and three) and risk of injury to a child pursuant to § 53-21 (a) (2)[12] (counts two and four) constituted a violation of his constitutional right against double jeopardy. Specifically, the defendant argues that rather than the state reciting the language of the statutes it charged the defendant with violating in the operative information, the state instead selected specific acts of sexual assault—digital penetration and cunnilingus—and charged those as both sexual assault in the second degree and risk of injury to a child. According to the defendant, the identification of these specific acts as the basis for the risk of injury to a child charges bars the state from arguing that the sexual assault in the second degree charges were based upon another contact with the victim. Given his assertions, the defendant thus maintains that the trial court violated his right against double jeopardy when it failed to reverse his conviction for risk of injury to a child in violation of § 53-21 (a) (2) (counts two and four). In response, the state argues that the defendant's double jeopardy claim fails because sexual assault in the second degree and risk of injury to a child are different offenses. We agree with the state.

The defendant did not raise this claim before the trial court. He seeks review, therefore, pursuant to *Golding*.[13] Although the record is adequate for our review and the claim is of constitutional magnitude, the defendant cannot demonstrate that a constitutional violation existed that deprived him of a fair trial, and so his claim must fail. See *State* v. *Mark*, supra, 170 Conn. App. 265.

As a preliminary matter, we set forth the applicable standard of review and relevant legal principles that govern claims involving the constitutional right against double jeopardy. "A defendant's claim that a conviction violated his constitutional right against double jeopardy raises an issue of law; our review of such a claim is plenary. . . . The United States constitution contains the guarantee that [n]o person shall be . . . subject for the same offense to be twice put in jeopardy of life or limb . . . . The fifth amendment's prohibition of double jeopardy applies to state prosecutions through the due process clause of the fourteenth amendment. . . . The double jeopardy clause protects against a second prosecution for the same offense following acquittal, a second prosecution for the same offense after conviction and multiple punishments for the same offense." (Citations omitted; internal quotation marks omitted.) *State* v. *Antwon W.*, 118 Conn. App. 180, 186–87, 982 A.2d 1112 (2009), cert. denied, 295 Conn. 922, 991 A.2d 568 (2010). It is the final protection that is implicated in the present case.

"In determining whether two offenses are the same offense for double jeopardy purposes, we apply a two part test. First, we must determine whether the offenses arose out of the same act or transaction. . . . Second, we must determine whether the charged crimes constitute the same offense. . . . . Multiple punishments are a constitutional violation only where both conditions are met." (Citations omitted; internal quotation marks omitted.) Id., 187. Accordingly, "[t]he defendant on appeal bears the burden of proving that the prosecutions are for the same offense in law and fact." (Internal quotation marks omitted.) *State* v. *Alvaro F.*, 291 Conn. 1, 6, 966 A.2d 712, cert. denied, 558 U.S. 882, 130 S. Ct. 200, 175 L. Ed. 2d 140 (2009).

The parties in the present case do not dispute that the conduct alleged in counts one and two of the information arose out of the same act or transaction. Likewise, they agree that the conduct alleged in counts three and four of the information arose out of the same act or transaction. Accordingly, our analysis focuses on the second prong of the test, namely, whether the defendant's conviction of sexual assault in the second degree under § 53a-71 (a) (1) (counts one and three) and risk of injury to a child under § 53-21 (a) (2) (counts two and four) violated the constitutional prohibition against double jeopardy because those crimes constitute the same offenses. See id.

"Traditionally we have applied the [test set out in *Blockburger* v. *United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932)] to determine whether two statutes criminalize the same offense . . . . Under that test, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . . This test is a technical one and examines only the statutes, charging instruments, and bill of particulars as opposed to the evidence presented at trial. . . . Thus, [t]he issue, though essentially constitutional, becomes one of statutory construction. . . .

"Our courts have addressed the relationship between risk of injury to a child and the various degrees of sexual assault in the context of double jeopardy claims on several occasions, each time concluding that the two crimes do not constitute the same offense. In *State* v. *Bletsch*, [281 Conn. 5, 28–29, 912 A.2d 992 (2007)], for example, we . . . concluded that, under the charging instruments in that case, the crimes of sexual assault in the second degree under . . . § 53a-71 (a), and risk of injury to a child under § 53-21 (a) (2), do not constitute the same offense for double jeopardy purposes because the language of the statutes makes it possible to have sexual intercourse under § 53a-71 (a) without touching the victim's intimate parts under § 53-21 (a)

(2), and vice versa." (Citations omitted; internal quotation marks omitted.) *State* v. *Alvaro F.*, supra, 291 Conn. 7.

The defendant contends, however, that *State* v. *Bletsch*, supra, 281 Conn. 28, is distinguishable from the present case because in that case the state copied, nearly verbatim, the language of the statute in which it charged the defendant with violating in the information. Contrary to *Bletsch*, the defendant here contends that the state alleged exactly the same facts in support of each of the charged offenses at issue, and, thus, the specifics contained in the information made count one the same offense as count two, and count three the same offense as count four because "the state necessarily proved the risk of injury to a [child] counts when it prove[d] the sexual assault in the second degree counts." We disagree.

The defendant's argument is based on the precise language used in the information that set forth the charges against him. The information filed by the state alleged in relevant part: "Count one: The undersigned Senior Assistant State's Attorney charges the defendant . . . with the crime of sexual assault in the second degree in violation of . . . [§] 53a-71 (a) (1) and alleges that on or about October 2007–October 4, 2009 in East Hartford, Connecticut, the defendant engaged in sexual intercourse to wit: digital intercourse with another person who was thirteen years of age or older but under sixteen years of age and the defendant was more than three years older than such person.

"Count two: The undersigned Senior Assistant State's Attorney further charges the defendant . . . with the crime of risk of injury to a [child] in violation of . . . [§] 53-21 (a) (2) and alleges that on or about October 2007–October 4, 2009 in East Hartford, Connecticut, the defendant had contact with the intimate parts of a child under the age of sixteen years and subjected a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child to wit: digital intercourse.

"Count three: The undersigned Senior Assistant State's Attorney further charges the defendant . . . with the crime of sexual assault in the second degree in violation of . . . [§] 53a-71 (a) (1) and alleges that on or about 2008 in East Hartford, Connecticut, the defendant engaged in sexual intercourse to wit: cunnilingus with another person who was thirteen years of age or older but under sixteen years of age and the defendant was more than three years older than such person.

"Count four: The undersigned Senior Assistant State's Attorney further charges the defendant . . . with the crime of risk of injury to a [child] in violation of [§] 53-

21 (a) (2) and alleges that on or about 2008 in East Hartford, Connecticut, the defendant had contact with the intimate parts of a child under the age of sixteen years and subjected a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child to wit: cunnilingus."

Although the defendant contends that the state provided the same facts for counts one and two and counts three and four in the information, our Supreme Court has previously concluded that "[i]t is irrelevant that the state may have relied on the same evidence to prove that the elements of both statutes were satisfied." *State* v. *Kirsch*, 263 Conn. 390, 421, 820 A.2d 236 (2003). Rather, "the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." (Internal quotation marks omitted.) Id., 420.

After examining the elements of the charged offenses in the information, it is clear that § 53a-71 (a) (1) and § 53-21 (a) (2) each requires proof of a fact that the other does not. For counts one and three, to prove that a defendant is guilty of sexual assault in the second degree in violation of § 53a-71 (a) (1), the state was required to establish the following elements: "(1) a person engages in sexual intercourse,[14] (2) with another person who is thirteen years of age or older but under sixteen years of age, and (3) the actor is more than two years older than such person." (Emphasis omitted.) *State* v. *Rivera*, 84 Conn. App. 245, 249, 853 A.2d 554, cert. denied, 271 Conn. 934, 861 A.2d 511 (2004). In contrast, for counts two and four, "[t]o convict the defendant of risk of injury to a child under § 53-21 [a] (2), the state must prove that (1) the defendant had contact with the intimate parts of, or subjected to contact with his intimate parts, (2) a child under the age of sixteen years, (3) in a sexually and indecent manner likely to impair the health or morals of such child." (Internal quotation marks omitted.) *State* v. *Alvaro F.*, supra, 291 Conn. 10.

Although those two offenses both share similar characteristics, it is clear that each requires proof of facts that the other does not. Specifically, "[r]isk of injury to a child requires proof that the contact was made in a sexual and indecent manner likely to impair the health or morals of the child, while sexual assault in the second degree does not. Sexual assault in the second degree requires proof of sexual intercourse, while risk of injury to a child does not." *State* v. *Rivera*, supra, 84 Conn. App. 249–50. "Thus, although a defendant may not be convicted under § 53-21 (a) (2) unless the state proves that the contact was made in a sexual and indecent manner likely to impair the health or morals of such child, there is no such requirement under [§ 53a-71 (a) (1)]." (Internal quotation marks omitted.) *State* v. *Alv-*

*aro F.*, supra, 291 Conn. 10. Moreover, this court and our Supreme Court previously have concluded that sexual assault in the second degree in violation of § 53a-71 (a) (1) and risk of injury to a child in violation of § 53-21 (a) (2) are in fact separate offenses. See id. (risk of injury to child and various degrees of sexual assault do not constitute same offense for purposes of double jeopardy); *State* v. *Antwon W.*, supra, 118 Conn. App. 190–91 (unlike offense of risk of injury to a child in violation of § 53-21 (a) (2), "sexual assault in the second degree in violation of § 53a-71 (a) (1) does not require proof that the contact was made in a sexual and indecent manner likely to impair the health or morals of the child" [footnote omitted]); *State* v. *Ellison*, 79 Conn. App. 591, 602, 830 A.2d 812 (same), cert. denied, 267 Conn. 901, 838 A.2d 211(2003); see also *State* v. *Bletsch*, supra, 281 Conn. 28 (sexual assault in second degree and risk of injury to child do not violate double jeopardy, as each offense requires state to prove element that other does not); *State* v. *Rivera*, supra, 84 Conn. App. 249 (same).

In light of the foregoing, we conclude that the crimes of sexual assault in the second degree in violation of § 53a-71 (a) (1) and risk of injury to a child in violation of § 53-21 (a) (2) do not constitute the same offense under *Blockburger*, as each crime requires proof of a fact not required by the other.[15] Thus, the conduct alleged in counts one and two do not constitute the same offense nor does the conduct alleged in counts three and four. We, therefore, conclude that the defendant's claim fails under the third prong of *Golding* because the constitutional violation he alleges does not exist. See *State* v. *Golding*, supra, 213 Conn. 240.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[2] Within this due process claim, the defendant also contends that the text message had important impeachment value, and its loss deprived him of "a singular opportunity to counter the state's narrative of confession and consciousness of guilt." The defendant further contends that the court should have issued an adverse inference instruction about the lost text message. As we further discuss in this opinion, there is an inadequate record to review the defendant's due process claim.

[3] The specific content of the text message was not entered into evidence because it could not be retrieved.

[4] The following colloquy occurred between the defense counsel and M:

"[Defense Counsel]: "And after that, either to [Torres] or to the East Hartford Police Department, you told someone that you had received a text from [the defendant]. Is that correct?

"[M]: That's correct. . . .

"[Defense Counsel]: Which—did you tell [Torres] or the police department first? Do you remember?

"[M]: I can't remember which one I told . . . first.

"[Defense Counsel]: You—but you wound up telling both, correct?

"[M]: Yes, I did.

"[Defense Counsel]: And both told you to hang on to that text because it might be important, right?

"[M]: That's correct. . . .

"[Defense Counsel]: Where is that text now? Did anybody retain a copy of it?

"[M]: No. . . .

"[Defense Counsel]: Did you delete it?

"[M]: No, I didn't delete it.

"[Defense Counsel]: Well, where is it?

"[M]: My phone [got] damaged, and I have another phone."

[5] The following colloquy occurred between defense counsel and Kelsey:

"[Defense Counsel]: Did you actually see the text message?

"[The Witness]: I did read the text message. . . .

"[Defense Counsel]: Okay. Did you make any effort to memorialize it or record it?

"[The Witness]: No. No, I didn't.

"[Defense Counsel]: Is there a reason why not?

"[The Witness]: I believe they had probable cause—enough probable cause with [the defendant's] statement to submit a warrant. I didn't really need that, and it only said he was sorry."

[6] The following colloquy occurred between the prosecutor and Torres:

"[The Prosecutor]: All right. And at that time, did [MT] show you anything relative to her phone?

"[Torres]: Yes.

"[The Prosecutor]: What was that?

"[Torres]: It was a text from [the defendant].

"[The Prosecutor]: Okay. And what did the text say?

"[Torres]: I don't know exactly what the text says, but I recall that it was an apology in regards to the situation that occurred between him and [the victim].

"[The Prosecutor]: From your recollection, do you know if he admitted any conduct in that text?

"[Torres]: Yes.

"[The Prosecutor]: Okay. As a [department] worker, although, you're not in charge of criminal investigation, did you save that text at all. . . .

"[Torres]: No, I didn't."

[7] Napolitano testified that there were numerous text messages from the defendant's number to M's number, but due to a lapse of time, he was unable to retrieve them.

[8] The defendant, however, has not cited any authority for his assertion that these factors suffice to establish an adequate record for review of his claim on appeal.

[9] The conflicting testimony consists of testimony from M, Kelsey, Torres, and the defendant. The testimony from M, Kelsey, and Torres explained that they had seen the text message sent from the defendant to M and that the content of the text message was the defendant apologizing for his behavior toward the victim. By contrast, in testifying that the text message was not inculpatory, the defendant stated that "I might have been drinking and that's how something could have happened, but as far as I know nothing has happened, and I didn't do anything."

[10] In *State* v. *Walker*, supra, 147 Conn. App. 29 n.4, this court further stated: "Although our Supreme Court in *Darden* remanded the case to the trial court to hold an evidentiary hearing and to apply the *Asherman* balancing test, such a remand was appropriate in that case because the defendant had raised a state due process claim before the trial court, and the court had not conducted the necessary balancing test in light of then newly decided *State* v. *Morales*, supra, 232 Conn. 707. . . . In the present case, the defendant never raised a state due process claim nor asked the court to apply the now well established *Asherman* factors. Accordingly, we conclude that it would be inappropriate to remand the case for an evidentiary hearing." (Citation omitted.) This is analogous to the present case where the defendant did not raise a state due process claim, ask the trial court to apply the *Asherman* factors or request the court to issue an adverse inference instruction during the trial. Following *Walker*, we, therefore, conclude that it would be inappropriate to grant the defendant's request to reverse his conviction and to remand the case for a new trial that includes an adverse inference instruction because the defendant did not raise such issues/requests before the trial court.

[11] General Statutes § 53a-71 (a) (1) provides in relevant part: "A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and: (1) Such other person is thirteen years of age or older but under sixteen years of age and the actor

is more than three years older than other such person . . . ."

[12] General Statutes § 53-21 (a) provides in relevant part: "Any person who . . . (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of . . . a class B felony for a violation of subdivision (2) of this subsection, except that, if the violation is of subdivision (2) of this subsection and the victim of the offense is under thirteen years of age, such person shall be sentenced to a term of imprisonment of which five years of the sentence imposed may not be suspended or reduced by the court."

[13] As previously discussed in part I of this opinion, under *Golding*, "[a] defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Mark*, supra, 170 Conn. App. 264.

[14] General Statutes § 53a-65 (2) defines sexual intercourse as "vaginal intercourse, anal intercourse, fellatio or cunnilingus between persons regardless of sex. Its meaning is limited to persons not married to each other. Penetration, however slight, is sufficient to complete vaginal intercourse, anal intercourse or fellatio and does not require emission of semen. Penetration may be committed by an object manipulated by the actor into the genital or anal opening of the victim's body."

[15] In addition, we note that "[o]ur analysis of double jeopardy claims does not end, however, with a comparison of the offenses. The *Blockburger* test is a rule of statutory construction, and because it serves as a means of discerning [legislative] purpose, the rule should not be controlling where . . . there is a clear indication of contrary legislative intent." (Internal quotation marks omitted.) *State* v. *Mark*, supra, 170 Conn. App. 268. "However, [w]hen the conclusion reached under *Blockburger* is that the two crimes do not constitute the same offense, the burden remains on the defendant to demonstrate a clear legislative intent to the contrary." (Internal quotation marks omitted.) *State* v. *Antwon W.*, supra, 118 Conn. App. 191. In the present case, the defendant has provided no analysis to demonstrate that the legislature did not intend the crimes described by § 53a-71 (a) (1) and § 53-21 (a) (2) to be separate offenses.